### DUNN and Another *v.* HALL.

The publisher and proprietor of a newspaper is liable for a libel published in his paper, and circulated to his subscribers, though it was published without his knowledge or consent, when he was absent, by his agent, who had received instructions from the publisher to refuse its publication.

APPEAL from the *Dearborn* Circuit Court.

SMITH, J.—This was an action of slander, brought by the appellee against the appellants. The declaration alleges that, on, &c., the appellants were the publishers of a certain newspaper, and published in said newspaper of and concerning the appellee, a certain false, scandalous, malicious, and defamatory libel over the signature of one *E. W. Jackson*, containing, amongst other things, the false, scandalous, malicious, and defamatory matter of and concerning the appellee; that is to say: " As *Hall's* masters have made another attack upon me, (meaning the author,)

May Term,
1849.

Dunn
v.
Hall.

and compelled the poor vagabond of the *Register* (meaning the plaintiff) to publish it; and as I (meaning the author) am going down the river in a few days, I want you all to understand my true position in reference to the vile and infamous attacks which have and are being made against me by the *Wilmington* junto through their infamous tool, *Hall*, of the *Register*, (the plaintiff meaning,) and you must again permit me to intrude my name before you. You are all aware that I (the author meaning) do not state to-day that which I am not ready to sustain to-morrow. I state nothing but facts, and, therefore, never retract. I (the author meaning) have stated, again state, and propose to prove, that the miserable scoundrels who control the vagabond *Hall* (meaning the plaintiff) and the *Register*, have been and now are, with that filthy, slanderous sheet, pursuing an anti-democratic course, and, that the poor, cowardly, vagabond, *Hall* (meaning the plaintiff) was once willing and anxious to publish a whig paper in *Rising Sun* but was prevented by his father, who refused to let him have the press. For stating these things I have been slandered by that polluted junto. Their tool, (meaning the plaintiff,) in a late paper, says he can prove the falsity of these charges. I now call on the whole infamous mess, junto, tool, and spy, to redeem this pledge, to produce one tittle of evidence to disprove the above charges. That they may have something farther to do, I (the author meaning) now charge the nasty tool (meaning the plaintiff) with being a gambler, drunkard, fool, and coward; a slanderer, and a poor, insignificant liar, and have the evidence in possession to establish the truth of these charges. I further charge him (meaning the plaintiff) with having recently committed a dark deed, which I am not now disposed fully to disclose. The public, however, is aware, that a case of infanticide (inhuman murder in fact) occurred not long since in the vicinity of *Wilmington*. The subject was illegitimate, and fell a victim to the hellish designs of a demoniac parent. The note published by *Hall* (meaning the plaintiff) on the subject had not enough of mysticism in it to keep down

the suspicion which rests upon the murderous and villainous seducer. If *Hall* (plaintiff meaning) does not look wild the circumstances of this case will be detailed to the world, disclosing a history of crime too revolting for sensitive nerves to bear. He (the plaintiff meaning) now knows that I (the author meaning) have a clue to facts which he (the plaintiff meaning) supposed were buried in the inmost recesses of a foul heart, ensconced in the bosom of an infidel wretch who is capable of a crime of the deepest and most damnable dye. To his (the plaintiff's meaning) shame be it charged, that he (the plaintiff meaning) has, by his profligacy, almost destroyed the means of his respectable father's living, and the old gentleman is about to go down pennyless and sorrowing to the grave." Thereby meaning that the said plaintiff was and is a poor, contemptible, insignificant, liar, gambler, drunkard, fool, coward, slanderer, and vagabond, and had been, and was, guilty of begetting a bastard child and murdering the same. By means whereof, &c.

The appellants pleaded " not guilty." The jury found the issue for the appellee and assessed his damages at 500 dollars. Motions in arrest of judgment and for a new trial were overruled.

A bill of exceptions sets out the evidence adduced at the trial, the instructions given to the jury by the Court, and some instructions which were asked for by the appellants, but which the Court refused to give.

The appellee proved that, on the 17th of *March*, 1843, he was the publisher of a newspaper called the *Democratic Register*, and that the appellants were the publishers of another newspaper styled the *Political Beacon*. He then offered in evidence a number of the latter paper, issued and published on the day last named, which contained a communication addressed " To the *Democrats* of *Dearborn* county," and signed " *E. W. Jackson*," corresponding with that set out in the declaration.

The appellee next read, from the same number of the *Political Beacon*, an article purporting to be editorial, which was in the following words :

" We publish to-day a communication from *E. W. Jackson*, Esq., in response to the *Register*. In this instance we depart from the rule which we had adopted. This rule, however, was conceived before we learned anything of the understanding that had been made between Mr. *Jackson* and the late proprietor of the *Beacon*. Mr. *Jackson* is a respectable citizen, and one of our most influential friends. He feels that his character has been wantonly assailed, and without provocation. This assault was commenced before the establishment came into our hands; Mr. *Jackson* was permitted to respond through the columns of this paper, as he was destitute of other means of reply. Since the *Beacon* came under our charge, this attack has been renewed, and Mr. *Jackson* demands of us, as a right which had been, guarantied to him by the former proprietor, the use of our columns. We feel bound to publish the communication. We assure our readers that this is the last article of a personal nature that shall occupy our space as a communication. It is said there are only three ways to get out of a quarrel—fight out, write out, or back out, but the safest way is to keep out."

A witness, named *Dennis*, then testified that, on the *Saturday* previous to the publication of said paper, the defendant, *Dunn*, started for *New Orleans*, leaving him, the witness, as foreman in the office; that, previous to that time, there had been a newspaper controversy carried on in the *Register* and *Beacon* between *Jackson* and *Hall*, and that *Dunn* had said, in an editorial article in the paper, that no more articles of a personal nature should be admitted; that just before *Dunn* started down the river he came into the office and told witness that *Jackson* would bring in a communication for publication, and directed the witness to strike out, or have *Jackson* strike out, everything in it exceptionable or of a personal or abusive character; that some days after *Jackson* came to the office and called out *Hutchen*, one of the hands employed as a journeyman; that the witness, fearing something was going on, told *Jackson* he must strike out of his article everything abusive, as *Dunn* said it must be done;

that *Jackson* said it must go in as it was, if at all, and witness then informed him that he must get the consent of *Watts*, or it should not go in, upon which *Jackson* left the office. That sometime after this the witness went to a store in the town, and there found *Jackson*, *Hutchen*, and *Watts* consulting about the publication of *Jackson's* article. *Watts* objected to its publication, and it was then proposed to publish it as an advertisement, to which the witness and *Watts* objected, on the ground that that would be equivalent to its publication as a communication, and a trick upon the readers of the paper. The witness then went away, leaving *Watts* and the others at the store. That sometime after this conversation the witness went to the office, and, on going to *Hutchen's* desk found him setting up *Jackson's* communication. The witness told *Hutchen* it was contrary to Mr. *Dunn's* instructions, and wrong; but *Hutchen* persisted in setting it up, and it was published and circulated to the readers of the paper at the next regular issue; that the communication appeared to be in the hand-writing of *Hutchen*, as was also the manuscript of the editorial article alluding to it in the same paper; that *Watts* did not see the proof-sheet of the paper, and was not in the office after the article had been set up and before the papers containing it were distributed; that *Watts* lived about a mile from town, and said he had no control over the paper.

*E. W. Jackson* testified that he wrote the article himself, but that it was altered in some respects after he signed it; that he spoke to *Dennis* about publishing it, who refused him; that he then went to *Watts*, who also refused to let it go in the paper; that he, *Jackson*, then told *Watts* that *Dunn* had given him the privilege before he went away, upon which *Watts* said, as *Dunn* was the editor, if he had consented, the article might go in, provided there was nothing in it personal or abusive; that witness did not show *Watts* the article, nor did the latter know what it contained, but he refused to allow it to go into the paper if it contained anything personal or abusive; that the witness then left the article at a store to be given

to *Hutchen*, to whom he had spoken about it; that he, the
witness, did not see it afterwards.

The defendant then offered in evidence the following
editorial article which appeared in the next number of the
*Political Beacon:*

"We have received a copy of the proceedings of a
meeting, held at *Wilmington* on the 20th inst.—called for
the purpose of publicly expressing their unqualified dis-
approbation of the conduct of *E. W. Jackson*, of *Miller*
township, and his abettors, in regard to the publication of
a malicious and libelous communication, published over
the signature of said *Jackson* in the last number of the
*Political Beacon*, &c., and at which meeting some sixty or
seventy of the most respectable citizens of *Wilmington*,
who signed the proceedings, declare, among other mat-
ters, that they are fully convinced that all the charges set
forth in the publication alluded to, touching the character
of *John B. Hall*, are false and unfounded in every parti-
cular, and without even a shadow of truth. We are un-
able, for the want of room, to comply with the request
that the proceedings should be published at length, and
trust that the above brief extract will be deemed suffi-
cient. In the absence of the acting editor, Major *Dunn*,'
we can only express our regret that the article com-
plained of should have found admittance into this paper.
It has been, and still is, our fixed and determined purpose
to admit nothing into the columns of this paper of a per-
sonally abusive or scurrulous character, or that would
needlessly wound the feelings or injure the fair character
of any man. We would take for our motto—'Nothing
extenuate, or set down aught in malice.'

"*Squire Watts.*"

The above being all the evidence, the Court gave the
following instruction to the jury:

"Malice is essential to the maintainance of this suit,
and of the existence of the malice the jury are the
judges. If the evidence is, that the libel in question was
not composed or written by the defendants, but by some
other person, and if it is also the evidence that an agent

of the defendants, without the authority of the defendants but in violation of their express prohibition; and there is no evidence of a recognition or approval of the publication of the libelous article, and there is satisfactory evidence of the disapproval and disapprobation of the defendants, the jury must find that the libel in question was not composed and published by the defendants, and that they are not guilty as charged in the declaration."

The appellants then called upon the Court to give the following additional charges, to-wit:

"It is necessary for a plaintiff, in a suit for libel, to allege in his declaration that the libelous matter was published maliciously, corruptly, and falsely, and it is as necessary for him on the trial of the case to prove the malice as to allege it;" and that, "unless the jury believed from the evidence that the defendants published the libel complained of maliciously, they must find for the defendants." This charge the Court gave, but accompanied it with the following explanation: "Malice is the important feature in all actions for libel or slander, but it is not in all cases necessary that the plaintiff should prove express malice. If the publication is libelous within itself, if it carries upon its face the charge of a crime, or such matter as the law implies to be a libel without the necessity of resorting to other evidence to explain it, the act itself imputes malice, and, therefore, in this case, if you find that the publication in question does contain such a charge, and that the defendants are guilty of making it public, that is sufficient, for the plaintiff need not bring witnesses to prove what were the motives or designs of the defendants in doing the act—proof of the act itself is enough."

The appellants also asked the Court to give the following charges, to-wit:

"If the jury believe, from the evidence before them, that *John P. Dunn* was absent from home and ignorant of the contents of the libel complained of, and had left orders with his agent not to publish anything abusive or excep-

tionable in its character, and that *Squire Watts* refused his assent to the publication of any abusive or libelous article, but prohibited the same, and the article in question was published in the said paper of the defendants, without their knowledge or consent but by their agent without their authority, the defendants are not guilty of maliciously publishing the libel in question." And "if the jury believe from the evidence that the defendants in this case did not *maliciously compose and publish*, and cause and procure to be published the libel in question, they must find them not guilty." These the Court gave, with the following explanation: "We think these charges are not correct as applicable to the facts of this case. We, therefore, say, that if *Dunn*, the owner and publisher of a newspaper, chose to leave his home, and place his paper in the charge of another person, he is responsible for the conduct of the person he so employed; the person so engaged is the owner's agent in that business, and he must be chargeable, no matter what private instructions he may have given him; so, if *Watts* is a joint owner of the concern and chooses to permit *Dunn* to edit it, or any other person, he, too, is responsible for the conduct of *Dunn*, or such other person so employed. We do not think that the publication, having been made against the express disapprobation of *Watts*, is, of itself, sufficient to discharge him if, by the exercise of due and proper diligence, he could have prevented the publication. If he chose not to oversee the publication of his paper, but to trust it to others, he must be held responsible to the public for the conduct of those he employs, even if his agent does make a publication which he had forbid. A case was stated in argument which will readily show the law on this subject. A printer owns a press and establishment for printing a newspaper, &c.; he necessarily employs workmen and they must have possession of his materials and establishment for the purpose, and they may, therefore, have it in their power to use them for an improper purpose, against the will and without the knowledge of the owner. Now, in such a case, if the owner gives all reasonable and

proper oversight of his business, and the offence is committed secretly, as if it is done in the office out of business hours, in the night, on a *Sunday*, at a time when it is not expected that the owner would be present to oversee his business, he ought not to be held answerable; but if the offensive publication is made in the ordinary course of his business, as in a public newspaper, the day of publication of which is known to the owner, and of the contents of which he could have been apprized in time to prevent its issue if he had chosen to take the trouble on himself to oversee his own business, we think he cannot screen himself because he was ignorant of its contents."

The appellants also asked the Court to instruct the jury "that, although, from the publication of libel, the jury may infer malice, and the publication of the libel imports malice in itself, yet it is competent for the defendant, from extrinsic circumstances, to repel that presumption, and if the jury find the libelous matter in question as published without the knowledge and consent of the defendants, and contrary to their express instructions to their agent, who was left in charge of the office, these are circumstances which may be considered by the jury as tending to repel the presumption of malice, and may be considered in mitigation of damages," which the Court refused to do.

The appellants then asked the Court to give the following charges, to-wit:

That although the publication of a libel imports malice of itself, yet "it is proper, under the general issue, for the defendants to show, by evidence, facts and circumstances tending to rebut the inference or presumption of malice" —and "that, although malice is either express or implied, and the publication of libellous matter imports malice, it is only an inference or presumption of law, and may be rebutted or explained away by evidence; the sufficiency of which evidence to rebut such malice is to be judged of by the jury from all the facts and circumstances proved before them." These the Court gave, but accompanied them with the remark, that they "were the

law abstractly considered, but it was for the jury to con-
sider whether they applied to the case before them, and
that the jury should take the same subject to, and in con-
nection with, the previous charges and explanations
thereof."

The appellants complain of the refusal of the Court to
give some of the instructions asked for, and of the expla-
nations and qualifications with which those that were
given were accompanied. The case has been argued
earnestly and ably by the counsel, but we have no hesi-
tation in coming to the conclusion that they have no just
cause of complaint. The whole scope and tenor of the
instructions given were quite as favorable to them as the
law would warrant.

Malice, in its common acceptation, means ill-will to-
wards some person, but in its legal sense it is defined to
be a wrongful act done intentionally, without legal justi-
fication or excuse—and, in ordinary actions for slander,
*malice in law* is sufficient, and is to be inferred from the
publication of the slanderous matter without such justi-
fication or excuse. In most, perhaps in all, instances
where an injury is committed against the person or pro-
perty of another, the actual intention of the author of
the mischief is immaterial. The law considers every one
whose neglect, carelessness, and want of due regard of
the rights of others occasions injury to others, equally
culpable and bound to make reparation to the extent of
such injury, as one who wilfully does the mischief. It
can make no difference to the party injured whether the
injury was occasioned by a wilfull act, or by negligence,
or a careless disregard of his rights, and such a consider-
ation ought not to affect his remedy. In the case of
*Prosser* v. *Bromage*, 4 B. & C. 247, it was held that, in a
case where *law implies such malice* as is necessary to sus-
tain the action, it is the duty of the judge to withdraw
the question of malice from the consideration of the jury.
No doubt, however, this implication of law may be re-
butted by evidence of facts which would afford a legal
excuse for the publication of the slander, as in the cases

May Term,
1849.

DUNN
v.
HALL.

put by the judge in the trial of this case, in which slanderous matter might be published by the employees of a printing office, with the materials of the proprietor, but which he could not, by care and diligence in the transaction of his business, have prevented, and it would be a question for the jury whether such facts existed. But what facts, when proved, would amount to such legal excuse would be a question of law; and we may test the propriety of the instructions by inquiring whether any facts available to the appellants as an excuse were proved in the present case.

It is plain, from the general context of the decisions in cases of this kind, that booksellers and publishers of newspapers are considered as standing in situations of peculiar responsibility, and far from relaxing in their favor the general rule that all persons are bound so to carry on their trade or business as not to injure others, the Courts of law have felt the necessity of applying it in their cases with the utmost stringency. The press is a most potent engine for the diffusion of both good and evil, and, while on the one hand we can scarcely estimate too highly the advantages of its perfect freedom, for all useful purposes, on the other, we cannot but be sensible of the necessity of a strong curb to prevent such freedom from degenerating into licentiousness. The law, however, in holding publishers of books and newspapers responsible for slanderous attacks upon private character, only carries out, with respect to them, the same principles which are applicable to injuries resulting from the transaction of other kinds of business. It is a general rule that a principal is liable for injuries resulting to others, from his neglect, or the neglect or incompetency of his agent, in the course of his employment as well as for those resulting from his own positive or intentional acts. So it has been repeatedly held in the case of booksellers, that, when a book or pamphlet containing slanderous matter was sold from the shop in the usual course of trade, the proprietor was responsible, and that it was no excuse that he was ignorant of the contents, or that it

was sold by a servant when the master was absent at a distance and had no knowledge that such a book had ever been in his shop or was sold on his account. Bac. Ab. Lit. Libel, 458; 2 Stark. on Sland. 29, notes. Wend. Ed.

In the case of *Rex* v. *Gutch, Fisher,* and *Alexander,* 1 M. & M. 433, 22 Eng. Com. L. R. 353, the defendants were proved to be the proprietors of the newspaper containing the article charged to be libellous. It was then urged for the defendant, *Gutch,* that he was in a condition to show that he was perfectly innocent of any share in the criminal publication, as he was living, at the time, more than a hundred miles from the place of publication, without taking any share whatever in the management of the newspaper, which was wholly conducted by *Alexander;* but it was ruled by Lord *Tenterdon* that this was no excuse, and that a person who derives profit from, and who furnishes the means for carrying on the concern, and entrusts the conduct of the publication to one whom he selects, and in whom he confides, ought to be answerable, even criminally, although it cannot be shown that he was individually concerned in the particular publication. See also on the subject *Andres* v. *Wills,* 7 John R. 260, and *Rex* v. *Walter,* 3 Esp. R. 21. According to the principles established by these cases, and we have no doubt of their correctness, the circumstances detailed in the present case afford no excuse for the appellants. If Mr. *Dunn* himself had been at home and suffered one of his journeymen to insert the libellous article in his paper, under his own eyes, he certainly could not have excused himself by proving that he had given the journeyman private directions not to do so; and if he chose to leave the management of his business in the hands of a foreman, he must be held equally responsible for the neglect or incompetency of the latter, in not obeying his instructions, and in suffering such a thing to be done. If publishers could avoid responsibility by telling their foremen not to admit anything personal, and then absenting themselves while a libel was inserted, they could very easily make the newspapers vehicles for the circulation of the most atrocious

May Term,
1849.

THE BOARD OF
COMMISSION-
ERS, &c.
v.
WILSON.

slanders with perfect impunity. But, indeed, it would be presumed in all cases that a principal, in giving charge of his business to an agent, directed such agent to transact it lawfully, and proof that he instructed such agent to manage it unlawfully, seems to be superfluous and irrelevant for any purpose.

*Per Curiam.*—The judgment is affirmed.

*A. Lane*, *D. S. Major*, and *J. T. Brown*, for the appellants.

*J. Ryman*, for the appellee.