[No. 1,724.]

## JOHN DOWNS WILSON v. GEORGE K. FITCH, JAMES NISBET, JAMES W. SIMONTON, AND FRANKLIN TUTHILL.

ARTICLE LIBELOUS ON ITS FACE. — When an article in a newspaper imputes to a person grave offenses and dishonest practices, which, if established, would bring him into general contempt and disgrace, it is actionable on its face.

PROOF OF COLLOQUIUM.—When an alleged libel is actionable *per se,* and still a colloquium is inserted in the complaint, it is unnecessary to prove the colloquium.

Points decided.

WHEN COLLOQUIUM NOT NECESSARY. — A colloquium is not necessary, except when the libel is not actionable on its face, but has a covert libelous meaning.

EVIDENCE OF BELIEF IN ACTION FOR LIBEL.—In an action for damages for publishing a libel, in which it is stated that the owners of a mine believe that they have been swindled by the plaintiff, testimony that such owners, at the date of the publication, believed that they had been swindled, is not admissible, either in justification or mitigation of damages.

IDEM.—If the libel assert the defamatory matter, not as a fact, but only as the belief of the author, or as a rumor, or general suspicion, the libel cannot be justified by proof that the author believed it to be true, or that there was such a rumor, or general suspicion.

IDEM.—In order to justify such publications of the belief of the author or of others, the defendant must prove the truth of the matter published.

PRIVILEGED COMMUNICATION—PROOF OF MALICE.—The trustee of a private corporation is not a public officer in such a sense as to enable the publishers of a newspaper to claim an article published concerning him and criticising his conduct as trustee, as a privileged communication, and therefore compel such trustee, in an action for libel, to prove express malice.

DEFAMATORY PUBLICATION NOT PRIVILEGED.—A defamatory publication in a public journal, concerning a private person, is not privileged, so as to require proof of express malice on the part of the plaintiff, simply because it relates to a subject of public interest, and was published in good faith, without malice, and from laudable motives.

IDEM. — In such case the publisher, in order to rebut the presumption of express malice, should be allowed the fullest opportunity to show the circumstances under which the publication was made.

EVIDENCE OF DEFENDANT IN ACTION FOR LIBEL. — In an action for a libel, the defendant cannot introduce in evidence libelous articles, published by other persons, before the publication of the alleged libelous article, whether they refer to the same transactions spoken of in the article published by the defendant, or to other matters.

IDEM.—In an action of libel, the defendant cannot introduce evidence to show that prior to and up to the time of the publication by defendant, the plaintiff had been generally reported and suspected to have been guilty of the acts imputed to him in the libel.

VERDICT AGAINST WEIGHT OF EVIDENCE.—The appellate Court will not disturb the verdict of a jury on the ground that it was not justified by the evidence, when there was a substantial conflict in the testimony, even though it is greatly against the weight of evidence.

VERDICT FOR EXCESSIVE DAMAGES.—In an action for a libel, if there is *no proof of* malice or ill-will toward plaintiff, and the publication is made in the usual course of defendants' business as public journalists, in the full belief that the article was true, after a careful inquiry from an apparently reliable source, the plaintiff is not entitled to punitive damages.

APPEAL from the District Court of the Twelfth Judicial District, City and County of San Francisco.

The defendants were the editors and proprietors of the *Evening Bulletin*, published in San Francisco. The plaintiff and several others owned a silver mine in the State of Nevada, and were incorporated under the name of the Santiago Mining Company, and the plaintiff became one of the trustees of the corporation. The plaintiff owned and sold stock in the corporation. On the 3d day of November, 1868, the following article was published in the *Bulletin:*

### "THE STORY OF A PROMISING MINE.

" A year ago, or more or less, a Mr. Wilson came to town from Washoe, bringing some beautiful specimen bricks and rocks, and a straight story, as to a mining claim (the Zouave) that he owned, convenient to the Carson River. He was not anxious to sell, though he had some two thousand eight hundred feet in his claim, and it was undoubtedly rich. He had no objection, however, to impart to a few friends the intelligence of the brilliancy of his own prospects. He told his story to Mr. Peachy, of the firm of Halleck, Peachy & Billings, who induced him to let him have, for a short time, the refusal of some four hundred and fifty feet, at sixty-five dollars a foot. Mr. Peachy got the foreman of the California Mine (Virginia City) to take a look at the ground, who reported that the prospect was good, and at that price the investment would probably be safe. Mr. Peachy then called upon Lafayette Maynard, telling him that if he would take half of the shares at the price named, he would close the bargain with Wilson. Mr. Maynard consented, and the bargain was completed. A corporation was formed, and the new company, under the name of the Santiago, elected Mr. Maynard its President, who at the time was at Washoe, and, if we are not mistaken, in company with some of the partners,

visited the old Zouave, now the Santiago Mine, descended its incline, entered its galleries already excavated, and saw the gray rock which was alleged to be full of silver. Certainly they saw nothing to make them doubt that everything was as promising as had been represented; for, say what you will, except to experts in rock, the barren and the rich look exceedingly alike, when underground, by the flickering light of a candle, and even experts speak cautiously on such points when any great responsibility attaches to their word. The company was soon under full headway, with, as he deserved to be, Mr. Wilson one of its trustees.

"Measures were taken at once to develop the mine; Mr. Wilson knew of an admirable man for Superintendent. The others had no men to name, and so Mr. Wilson's man was chosen. He was instructed to push work with vigor—no capital should be lacking—but to practice economy in all his operations, and faithfully report all that he did or learned. He was to write frequently to the company, and his letters the Secretary was ordered to keep in an open drawer, where every stockholder could see them all. Other San Francisco capitalists heard of the good thing, and induced Wilson to let them in. Pioche & Bayerque bought some. The Barrons, who have been for years in mines, got not a little. Men connected with their house, the Barrons, Mr. Bell, and Mr. Young, the Superintendent of the New Almaden, took among them some eight hundred shares, buying generally at a much higher figure—from one hundred dollars up to one hundred and seventy-five dollars a share. Hall McAllister got some shares, but his were paid for in legal services. Judge Lake got some to the extent of the value of his handsome house on Lombard street. Judge Hoffman bought some. Other men of smaller means, seeing what kind of citizens were putting their money in, bought Santiago, sometimes with all their earnings. The richer owners could not keep them out. When inquired of, they gave the usual

advice: 'Don't touch anything in the way of mines, unless you can afford to lose all you invest; it is a lottery.' But they had not the heart to ▮▮▮ a good man poor because he was poor, and, being pressed they confessed that they believed in Santiago fully, and so the poor men invested, saying example was more cogent than precept, bought as deeply as they could, always of Wilson, but not generally at the highest rates, for Wilson seemed to have a heart under his ribs, and was willing to favor a friend who was struggling. One worthy bookkeeper put in thirteen thousand dollars that he had saved at the desk. The Superintendent's reports were always favorable. He generally obeyed orders, and left the adjectives out of his dispatches. He gave 'bare facts,' but the bare facts were heavy with silver and weighted with gold; some six hundred feet of the mine had been developed; none of the rock was poorer—most of it richer—than had been anticipated. The company, determined not to be misled, ordered him to take seven hundred tons of the rock from the open galleries and have it crushed at various mills; let there be no picking—let every pound that went to the surface be ground; they would have an assay on a grand scale that would faithfully show the average yield of their rock. The Superintendent soon reported that he had obeyed orders, and the result was forty dollars to the ton! That was magnificent. The buyers at the highest figure wished they had more stock. No one but Wilson would sell an inch, and he was rather yielding, in the goodness of his heart, to the importunities of friends, than selling of his own wish, or in accordance with the dictates of his judgment. Mr. Peachy bought more shares, paying at a higher figure this time, and giving for it the house on Rincon Hill which he had purchased of Mr. Tucker, the jeweler, giving him Wide West stock. The owners thought if custom mills give us forty dollars a ton, with a mill of our own we can get better than that; for such is the faith concerning

custom mills the whole land over. They cheerfully agreed to buy, and soon negotiated for a mill on the Carson River, owned by Raymond & Thompson—a mill of fine facilities, convenient to their mine, and of abundant water-power. In the mine was an engineer formerly of the California Mine, and the old and trusted acquaintance of some of the heaviest owners. This gentleman wrote down to the President that he had taken the responsibility of sending a ton of the average rock to the Mexican Mill, which, since the Mexican Mine had caved in, was crushing some for customers. This announcement was not welcomed by Wilson. He said the Mexican Mill, holding its head very high, refused the privilege, accorded by all others, of allowing a representative from the mine whose ore it crushed to stand by and see that a fair return of the silver and gold was made. He prophesied that if the order was not countermanded, the rock would be reported to yield less than its true measure. He protested against exposing the credit of the mine by any such experiment. The company decided otherwise, however. They knew the Mexican Mill owners; they believed they would deal honorably with their customers; if the rock would not stand its test, they wanted to know it. They could pay their debts; they could meet their notes; the stock was not on 'change; they wanted no more credit than the rock entitled them to have. The Mexican crushed its ton, and reported a yield of only thirteen dollars to the ton! This was an eye-opener. The mills charge twenty-five dollars a ton for crushing, and it is said to cost full thirteen dollars a ton for a mill to run out a ton. Unless there was some mistake, their mine would ruin them. Investigations followed. It came out that Wilson had sold his shares so far down that, of his original twenty-eight hundred feet, he had but nineteen left! Either he must have lacked the ambition of his fellow owners, or he was trying to get out of a concern which he had all along represented as the richest thing

east of the Sierras." Further examination showed that the Superintendent and Direc Wilson had been in daily confidential correspondence. Wilson said they owned together many other interests, and had a right to correspond freely concerning them. The other Director thought it a suspicious circumstance, a breach of faith, if this correspondence concerned Santiag son for the Superintendent's removal iding his time with other enterprises, when the company thought they had the monopoly of his services. Still further investigations revealed that the seven hundred tons of rock which yielded the forty dollars a ton were not, as was specifically ordered, taken from the whole exposed face of the mine, but picked from one rich spot, if not absolutely salted at the mills. The investigations are not yet ended, but the chief owners believe that they have been outrageously swindled.

"Meanwhile the assessments were thickening to pay thirty-five thousand dollars every sixty days, towards the mill purchase. Some of the heavier owners proposed to ease the burden of the lighter shareholders, and save their own credit, by buying the mill, at the cost to the company, for the use of another company in which they were interested. But this alarmed the small holders. 'A freeze out!' they exclaimed; 'none of that; we want the mill; we believe in the mine!' So, the heavy men, to keep the peace, and save their honor, vote to keep the mill, and the assessments go on. How they are borne may be guessed by the following advertisement which appears in a morning newspaper, and which we insert free, as a part of the story. Wilson's number of shares is set down as greater than is stated above. The explanation of that, however, is not difficult; it is small as here given:

Statement of Facts.

"'SANTIAGO MINING COMPANY.
"'OFFICE: SAN FRANCISCO, November 2d, 1863.

"'Notice is hereby given. that, in accordance with the laws of the State of California, and pursuant to an order of the Board of Trustees of said company, there will be sold at public auction, at the salesroom of Jerome Rice & Co., No. 327 Montgomery street, San ▓▓▓▓▓▓isco, on Saturday, the fifth day of December next, at twelve o'clock, noon, to the highest bidder, for cash, in United States gold coin, so many shares of the capital stock of the company standing in the names of the following shareholders as will be necessary for the the payment of an assessment levied October 3d, 1863, together with expenses of advertising and sale, to wit:

| NAMES. | Shares. | Amount. |
|---|---|---|
| J. B. Bayerque | 89 | $890 |
| A. C. Peachy | 400 | 4,000 |
| S. Heydenfeldt | 175 | 1,750 |
| L. Maynard | 220 | 2,200 |
| Eug. Celle | 50 | 500 |
| E. A. Breed | 50 | 1,000 |
| J. K. Whittaker | 40 | 800 |
| G. T. Knox | 50 | 1,000 |
| W. E. Barron | 10 | 100 |
| Barron & Co. | 405 | 4,000 |
| Hall McAllister | 37 | 740 |
| R. Bayerque | 24 | 240 |
| A. Borel | 20 | 200 |
| C. H. Reynolds | 10 | 200 |
| J. C. Badarous | 4 | 80 |
| N. Larco | 10 | 100 |
| C. Bonner | 30 | 600 |
| T. Bonacina | 10 | 100 |
| R. J. Moritz | 7 | 140 |
| J. Young | 80 | 800 |
| Thos. Bell | 193 | 1,930 |

Statement of Facts.

SHAREHOLDERS—Continued.

| NAMES. | Shares. | Amount. |
|---|---|---|
| Juln. McAllister.......................................... | 24 | $480 |
| Ogden Hoffman........................................ | 65 | 650 |
| D. Lake................................................ | 70 | 1,400 |
| E. Barron.............................................. | 112 | 1,120 |
| J. B. Shaw............................................. | 10 | 100 |
| J. D. Wilson........................................... | 54 | 890 |
| F. L. A. Pioche........................................ | 100 | 1,000 |
| Chas. Hosmer.......................................... | 20 | 200 |
| P. W. McKay (assessments Nos. 1 to 10 included)......................................... | 50 | 2,650 |

" 'By order of the Board of Trustees.

" 'EDWARD A. BREED, Secretary.'

" There may be some who, having no faith in mankind, will insist that this is a gigantic game of freeze out. Citizens generally will believe it to be one instance out of many that seldom come to light, where the shrewdest and most careful and honorable business men are led into operations whose results are more regretted by them on account of the mortification they must feel at seeing poor men ruined by being drawn into enterprises on the strength of their names, than for the thousands of dollars that are taken out of their own coffers and sunk. If that is the case, society is indebted to the capitalists in the 'Santiago' who allow the story to be told for the warning of a mining-mad community.

" Every honest exposure of the operations of a mining company or its agents, helps to break up the schemes of swindlers, which are doing more than anything else to prevent the development of the resources of the mineral States. Let the honest men who are diddled, thoroughly sift the

method of the deceit that makes them suffer, and with all the appliances of the law prosecute those who deceive them, and prospecting will be put on a firm basis, and California and the territories adjacent will continue every year to astonish the world with the bounty of their newly developed treasures. Meanwhile, every citizen finds a lesson in the story of the Santiago. Whether it was only a mistake or something worse, it is clear that it is not safe for any man to invest his all in any one mining speculation, however promising it may be, nor though the ablest business men in the community believe in it. Let the prospecting go on, but let no man stake his all on the realization of any one prospect that is not absolutely in the line of his own business."

This action was commenced to recover damages for the libel.

The defendants in the answer set up, among other defenses, the truth of the alleged libel. They also averred in the answer, that at the time of, and before the publication, the matters therein contained were commonly reported and generally believed, and that they published the same believing it to be true, after careful inquiry, and without malice, and that it referred to transactions and conditions of a public or general corporation, of which the plaintiff was a trustee and member, and that he was referred to in that capacity only, and that the publication was made in the usual course of defendants' business as public journalists, without ill-will or intent to defame the plaintiff.

On the trial one McCulloch was called as a witness for defendants, and he testified that he was a chemist and had obtained a patent for a process for reducing silver ore; that Wilson had obtained the right to use it in 1861 in Nevada. The counsel for defendants then offered in evidence a pamphlet, published by McCulloch in 1862, in which he had spoken of the plaintiff, and accused him of having tried

to induce the witness to make experiments with the process, and falsely represent it as a failure, so that the plaintiff might profit by a depreciation in mining stocks caused thereby. The plaintiff's attorney objected, and the Court ruled out the pamphlet. There was a daily paper published in San Francisco called the *Daily Morning Call.* On the 31st of October, 1863, the *Call* published an article in relation to the plaintiff's connection with the Santiago Mine, reflecting severely upon him. The defendants' attorney offered this article in evidence, and the plaintiff's attorney objected, and the Court ruled out the article. The jury found a verdict in favor of the plaintiff for seven thousand five hundred dollars, and the Court rendered judgment for that amount. The defendants appealed from the judgment and from an order denying a new trial.

The other facts are stated in the opinion.

*J. W. Winans,* for Appellants.

The Court erred in refusing to allow defendants to prove their assertion that: "The investigations are not yet ended; but the chief owners believe that they have been outrageously swindled." The evidence was competent in justification. The charge complained of was a distinct part of the alleged libel, and divisible from the rest. It could, therefore, be separately justified. (2 Selwyn's Nisi Prius, 1053; *Mowbray* v. *Walton,* 2 Barn. & Ald. 673.) Section thirteen of the Practice Act provides that: "The defendant may, in his answer, allege both the truth of the matter charged as defamatory, and any mitigating circumstances to reduce the amount of damages; and whether he prove the justification or not, he may give in evidence the mitigating circumstances." But this doctrine of justification, by proving the truth of the charge, is sustained fully by the authorities. (*Commonwealth* v. *Snelling,* 15 Pick. 341; *Bisbey* v. *Shaw,* 2 Kernan, 72; *Stow* v. *Converse,* 4 Conn. 33; *Thrall* v. *Smiley,*

9 Cal. 536; *Vanwyck* v. *Guthrie*, 4 Duer, 274; *True* v. *Plumley*, 36 Maine, 466, 481; 1 Hilliard on Torts, 340; 1 Starkie on Slander, 233; *Steele* v. *Southwick*, 1 Am. Lead. Cases, notes, 116; Voorhees' New York Code, Sec. 165, and notes.) Again, if the evidence of the truth of the charge, that the chief owners believed themselves to be outrageously swindled, did not constitute a justification, it was clearly admissible in mitigation of damages, yet the Court ruled it out on this ground also, although the point was expressly presented. (1 Maule & Selw. 284; *Earl of Leicester* v. *Walter*, 2 Campbell, 251; Anthon's Nisi Prius, notes, 38–40; *Gilman* v. *Lowell*, 8 Wend. 582; *Hanson* v. *Veatch*, 1 Black. 371; *Dewitt* v. *Greenfield*, 5 Ohio, 225; *Jenks* v. *Backhouse*, 1 Binney, 92; *Bailey* v. *Hyde*, 3 Conn. 466; *Bush* v. *Prosser*, 1 Kernan [11 N. Y.], 355; *Heaton* v. *Wright*, 10 How. Pr. 83.) And in *Stanley* v. *Webb*, 21 Barb. 148, a case very similar in principle to that we are considering, the court say: "The rule of law allowed the defendant to prove anything, under the general issue, which does not tend to a justification, but which falls short of that." That was an action for libel, and the attention of this Court is invoked to it as being strongly similar in its facts, as well as in its principles, to that under review. (*Remington* v. *Congdon*, 2 Pick. 315; *Bisbey* v. *Shaw*, 2 Kernan, 72, 73; *Weed* v. *Bibbins*, 32 Barb. 321; *Mapes* v. *Weeks*, 4 Wend. 662; Starkie on Slander, vol. 2, p. 95, note 2; *Root* v. *King*, 7 Cowan, 616, 617; *Chalmers* v. *Shackell*, 6 Carr. & P. 475; *Kennedy* v. *Gregory*, 1 Binney, 85.) The alleged libel constitutes a privileged communication. Its publishers, the defendants, were not, therefore, liable without proof of express malice. For a clear statement of the doctrine of privileged communications we refer to the opinion of an eminent jurist, Judge Parker, of New Hampshire. (*State* v. *Burnham*, 9 N. H. 41; *Bradbury* v. *Heath*, 12 Pick. 165; *Perkins* v. *Mit-*

*chell*, 31 Barb. 467; *Kelly* v. *Tingling*, 1 Queen's Bench, 699; *Garrett* v. *Gilbert*, 6 Gray, 97.)

The words complained of are not libellous, *per se*, as (in themselves) they cannot be said to import anything of a defamatory character concerning the plaintiff. They make no, direct charge against him of any kind whatever. It follows that what the defendants intended and understood them to mean, and what they were understood by those to whom they were published to mean, must be a matter of averment and proof. (*Gilman* v. *Williams*, 4 Wend. 320; *Andrews* v. *Woodmansee*, 15 Wend. 232; *Woolnoth* v. *Meadows*, 5 East. 463; *Dexter* v. *Taber*, 12 Johns. 239.)

Evidence of previous publication in other newspapers or journals, containing the same charges, was admissible to disprove malice, and in mitigation of damages. The Court erred in excluding the article in the *Daily Morning Call*, and that in McCulloch's pamphlet. (*Wyatt* v. *Gore*, 1 Holt's Nisi Prius, 299; *Romayne* v. *Duane*, 3 Wash. C. C. Rep. 246; *Morris* v. *Duane*, 1 Binney, 90; *Burns* v. *McCarkle*, 2 Browne, 90; *Wilson* v. *Apple*, 3 Ohio, 270.)

In *Morris* v. *Barker*, 4 Harrington, 521, the Court says it is reasonable "that although a man may not justify the uttering of a slander, nor attempt to prove its truth upon a plea of not guilty, yet, with a view to mitigate the damages, and disprove malice, he might show that before the uttering of the slander by the defendant it was generally reported and spoken of by others." In the case of *Bailey* v. *Hyde*, 3 Conn. 463, the Court thus declares: "Or if the fame of a person is disparaged by there having been reports in the neighborhood that he had been guilty of practices similar to those imputed to him, it is admissible." (*Treat* v. *Browning*, 4 Conn. 408; *Earl of Leicester* v. *Walter*, 2 Campb. 257; *Wyatt* v. *Gore*, 1 Holt's N. P. 299.)

*Wilson & Crittenden,* for Responder.:

The charge contained in the article was virtually one of swindling. The mere form of expression, "I *believe* he is a swindler," or "it is believed he is a swindler," does not alter the character of the libel. It would be remarkable if in actions of libel in the above instances, a man could either justify or mitigate the wrong of such publications in a newspaper, by himself taking the stand and swearing that he did believe it, or calling Smith or others to swear that they believed it. Private character is afforded a weak protection if such is the law. A sure mode of contumely and degradation is presented; easy of infliction, easy of justification, and impossible of refutation. The *belief* of a man's enemy concerning his conduct and principles would at once furnish the sword with which to assault, and the shield to avoid punishment in return. The charge, though made under the form of the belief of other persons, is in the eye of the law a direct charge of swindling, and therefore the only proof admissible in justification would be proof of *the fact* of swindling, and not merely the *belief* of others. (Heard on Libel, Sec. 176; *Waters* v. *Jones,* 3 Porter's Ala. R. 448; *Logan* v. *Steele,* 1 Bibb. 593; *Brooks* v. *Bemis,* 8 Johns. 455; *Root* v. *King,* 7 Cowen, S. C., 15; 4 Wend. 113; *Skinner* v. *Powers,* 1 Wend. 451; *Miller* v. *Miller,* 8 John. 74; *Stick* v. *Wisdome,* Cro. Eliz. 348; *Brown* v. *Lamberton,* 2 Binn. 34; *Nye* v. *Otis,* 8 Moss, 122; *Kennedy* v. *Gifford,* 19 Wend. 301; *Inman* v. *Foster,* 8 Wend. 603.)

It is now the established rule that to publish a libel, giving the name of the author, is as actionable as if no author's name was mentioned. And the proof that the person named told the publisher of the fact published is not even admissible in mitigation of damages.

The very clear and able opinion of KENT, Ch. J., in *Dole* v. *Lyons* (10 Johns. 449, *et seq.*), settles these questions on

principle forever, and has remained the settled law of New York, and we believe of the United States, ever since.

Evidence that a defendant had been told by another what he uttered against the plaintiff is as inadmissible in mitigation of damages as it is in justification, whether the author's name was given at the time of publication or not. (*Mapes* v. *Weeks,* 4 Wend. 659: *Inman* v. *Foster*, 8 id. 602; *Kennedy* v. *Gifford*, 19 Wend. 301; *Austin* v. *Hanchette*, 2 Root, 148; *Treat* v. *Browning et al.*, 4 Conn. 408.)

It is well settled that neither particular reports nor public reputation of the truth of the slander, nor of kindred charges against the plaintiff, are admissible. (*Inman* v. *Foster*, 8 Wend. 608; *Kennedy* v. *Gifford*, 19 id. 301; *Watson* v. *Buck*, 5 Cow. 499; *Root* v. *King*, 7 id. 613; *Fry* v. *Bennett*, 3 Bosw. 201; *Sheckel* v. *Jackson*, 10 Cush. 25.) This is not a privileged communication. A private person complains of a libel published in a newspaper, concerning him as a man. The authorities cited are utterly inapplicable. Mining is said to be a matter of great public interest. True, but not more so than agriculture, or commerce, or transactions in city property. Is a newspaper privileged to charge a man with being a swindler in town lots, because the sale of town lots is now a matter of great public attention? (*Littlejohn* v. *Greeley*, 13 Abb. Pr. R. 48, 49; *Root* v. *King*, 4 Wend. 122; *Sheckel* v. *Jackson*, 10 Cush. 26.) In the libel in the *Bulletin* no reference is made to the article in the *Call*. As was said in *Bond* v. *Kendall*, 36 Vt. 743, 'it lacks the *salvo* which has characterized all the cases in which it has been permitted to show that the defendant was reporting what had been told him by another, viz: the giving the name of the author.' Evidence that the defendant had been previously told of the slander by another, was rejected when offered in mitigation of damages in the following cases, also:

*Mapes* v. *Weeks*, 4 Wend. 659; *Gilman* v. *Lowell*, 8 id. 581; *Walcot* v. *Hall*, 6 Mass. 514; *Clark* v. *Munsel*, 6 Metc. 389; *Anthony* v. *Stevens*, 1 Mo. 256; *Roberly* v. *Preston*, 8 id. 462; *Thompson* v. *Bowers*, 1 Doug., Mich. 327; *Sheckel* v. *Jackson*, 10 Cush. 25; *Leister* v. *Smith*, 2 Root, 24; *Lewis* v. *Niles*, 1 Root, 346; *Jackson* v. *Stetson*, 15 Mass. 57; *Bond* v. *Wendel*, 36 Vt. 743; *Talbutt* v. *Clark*, 2 M. & Rob. 312.)

Were the damages excessive, or given under the influence of passion or prejudice? On this subject the code of civil practice in this State is very plain. It is not merely "excessive damages" which afford a sufficient ground of new trial, but they must be so excessive as to appear "to have been given under the influence of passion or prejudice." (Prac. Act, Sec. 193, cl. 5.)

The Court below, in the broad discretion which it exercised in determining the motion for a new trial, did not see any evidence of this passion or prejudice. (*Hall* v. *Bark Emily Banning*, 33 Cal. 525.)

By the Court, CROCKETT, J.:

If the alleged libel was actionable *per se*, it was unnecessary to prove the colloquium in order to make out a prima facie case for the plaintiff. When a libel is not actionable on its face, but has a covert, libelous meaning, a colloquium is necessary to explain the subject matter, and to bring to light the true interpretation of the libelous words. In such cases the colloquium must be proved. But in the present case the alleged libel is actionable on its face, and it was unnecessary to prove the colloquium. No unprejudiced person of ordinary intelligence can read the publication complained of, and avoid the conclusion that it imputes to the plaintiff grave offenses and dishonest practices, which, if established, would justly bring him into general contempt

and disgrace. The motion for a nonsuit was therefore properly denied.

The alleged libel contains a pa ph in these words: "The investigations are not yet ended, but the chief owners believe they have been outrageously swindled." The defendants offered to call the chief owners of the mine, to prove by them that at the date of the publication they believed they had been outrageously swindled. The Court excluded this proof, but decided that defendants were entitled to prove all the facts and circumstances tending to show that the owners, or any of them, had been swindled, and all facts and circumstances tending to create such belief. The defendants excepted, and assign this ruling as error. They claim that the proof was admissible, both in justification of that portion of the alleged libel and in mitigation of damages. But it was clearly inadmissible for either purpose. It cannot be denied, and the counsel for the defendants concedes to the fullest extent that it is well established, both on reason and authority, that if a libel assert the defamatory matter, not as a fact, but only on the belief of the author, or as a rumor or general suspicion, the libel cannot be justified by proof that the author believed it to be true, or that there was such a rumor or general suspicion.

In order to justify a publication, purporting to be made on the belief of the author that the fact was true, the defendant must prove the truth of the fact, and not merely that he believed it to be true. If one publish of another that he believes he was guilty of murder or arson, it is no justification to prove that he did in good faith believe it; but to make good the justification he must prove that the plaintiff was, in fact, guilty of murder or arson. This is conceded on all sides to be the law; and it results necessarily that if the publication complained of here had asserted that the author of it believed the chief owners of the mine had been swindled, it would not have been a justification to

prove that he did so believe. To justify the publication he must have proved t??????y had, in fact, been swindled. But how can it vary ??????principle which underlies this rule of law, that the charge is made, not as a matter of belief on the part of the author, but as the belief of other persons? If there be any difference in principle between the two propositions, more plausible reasons can be adduced why proof of the belief should be held to be a justification in the former case rather than in the latter. When the author publishes his own belief that a fact exists, he knows the sources of his information, and whether they are apparently reliable, and whether the conclusion drawn from the facts is reasonable. But these elements may all be lacking in respect to the belief of another. He may have had no plausible grounds whatever for the belief; and to permit a defamatory charge published as the belief of some other person, to be justified by proof that such person did believe the fact to be as stated, would subvert one of the most thoroughly well established rules of the law of libel, and break down one of the chief safeguards of private reputation. The proof which was offered and excluded was obviously inadmissible as a justification. Nor was it competent evidence in mitigation of damages. The "mitigating circumstances" which are permitted by section sixty-three of the code to be pleaded and proved, must be such as tend to rebut the presumption of malice, or to reduce its degree. All libels are conclusively presumed to be, in some degree, malicious; but there are different degrees and phases of malice; and some actionable defamatory publications (all of which the law deems to be malicious, except privileged communications), are in fact published without actual malice. It is eminently just, therefore, that the defendants, with a view to reduce the damages, should be allowed to rebut the presumption of malice by the proof of what the statute terms "mitigating circumstances;" that is to say, the cir-

Opinion of the Court—Crockett, J.

cumstances under which tion was made, and the real motives which induced

In this case the defendannitted to show the sources of their information as ██ ██rred facts, the circumstances under which the pub██ation was made, and the real motives which led to it; and they did, in fact, prove by the witness, Nisbet, that Maynard, one of the chief owners of the mine, stated to the defendants, or one of them, that he and the other principal owners believed they had been swindled. They were further permitted to show that they believed this information to be perfectly reliable, and published the facts as related to them by Maynard, in the full belief that they were true, and not from any malice or ill will toward the plaintiff, but only as a matter of general public interest. Could it, in any possible view of the subject, have tended further to extenuate the publication, if it had been proved that the chief owners did, in fact, then believe they had been swindled? It cannot, I think, be doubted that, so far as the conduct and motives of the defendants are concerned, the actual belief of the owners that they had been swindled is a wholly immaterial circumstance. The defendants were informed, from an apparently reliable source, that they did so believe; and they acted in good faith on this information, believing it to be true. Would it render the conduct of the defendants either more or less reprehensible if it afterwards appeared that the chief owners did or did not believe they had been swindled? In deciding on the conduct or motives of the defendants, the belief of the owners of the mine that they had been swindled was a false quantity. It in no respect touched the question at issue, to wit: the conduct and motives of the defendants in making the publication. If the defendants were credibly informed, from an apparently reliable source, that the owners did so believe, and if they acted on this information, believing it to be true, the extenuation was none the more

complete from the fac■■■■■wners did so believe, nor would have been a■■■■■■lete if they had not so believed. The fa■t o■■■■■■f was wholly immaterial, and could have no e■■■■■■e one way or the other toward elucidating the conduct motives of the defendants. The proof was, therefore, properly excluded.

Another point made by the defendants is that the publication was privileged, and that the defendants could not be held liable, except on the proof of express malice, of which, it is claimed, there was no evidence whatever. It is said to be privileged, because it was published by public journalists as a matter of general and peculiar public interest, and related to the conduct of the plaintiff in his capacity of trustee of a mining corporation. But this was a private and not a public corporation. The plaintiff was in no sense a public officer, and was responsible only to the stockholders and creditors of the corporation for the fidelity of his conduct as a trustee. His office was no more a public office than that of a trustee of a private corporation to build a bridge or construct a wagon road. Officers of this character have never been deemed public officers in such sense as to render them amenable to criticism, as in case of persons filling public offices of trust and confidence, in the proper administration of which the whole community has an interest. In the latter class of officers public policy demands that their official conduct should be open to unrestricted criticism, in which no malice is implied by law; and express malice must be proved to render the author liable. No case has been cited, nor am I aware of any, which holds that the trustee of a private corporation is a public officer in the sense claimed by the defendants. Nor can a defamatory publication in a public journal be said to be privileged simply because it relates to a subject of public interest, and was published in good faith, without malice, and from laudable motives. No adjudicated case, that I am aware of, has

ever gone so far. But whilst such
deemed privileged, so as to require pr
the publisher, in order to rebut th pres
should be allowed the fullest opp ty to show the cir-
cumstances under which the pub ation was made, the
sources of his information, and the motives which induced
the publication. The public interest, and a due regard to
the freedom of the press, demands that its conductors should
not be mulcted in punitive damages for publications on sub-
jects of public interest, made from laudable motives, after
due inquiry as to the truth of the facts stated, and in the
honest belief that they were true. On the other hand, if
the rule were further relaxed, so that such publications in
respect to private persons would be deemed privileged,
thereby shifting the burden of proof from the defendant to
the plaintiff, in respect to malice, there would be but little
security for private character.

It is easy for the publisher to show the circumstances under
which the publication was made, the sources of his informa-
tion, and the motives for the publication, and thus to rebut
the presumption of malice. But if the burden of proof was
on the plaintiff, it would often, and perhaps generally, be
very difficult, if not impossible, to prove express malice. I
think the present rule, which allows to the publisher the
fullest opportunity to rebut the presumption of malice,
secures to him all the protection which is consistent with a
due regard to the safety of private character.

There was no error in excluding from the jury the article
from McCullough's pamphlet, or the publication in the *Morn-
ing Call*. The former had no reference whatever to the
transactions referred to in the present case, and must be
deemed libelous, inasmuch as the Court had no means of
determining its truth or falsity by a judicial investigation.
A former distinct libel on the plaintiff by another person
ought not, on any principle of reason or justice, to be held

the second libel. If the rule were

frequently an innocent person was

ld be his chance for redress against each

successive libeler; the more flagrant his wrongs, the less remedy would the law afford him. It has often been decided that it is not admissible to prove in mitigation that prior and up to the time of the publication the plaintiff had been generally reported and suspected to have been guilty of the acts imputed to him in the libel. Some of the earlier cases hold such proof to be admissible. (*Earl of Leicester* v. *Walter*, 2 Camp. 251; 1 Maule & Selw. 284; Anthon's Nisi Prius, 38–40, and notes; *Noble* v. *Fuller*, Peak's Add. Cases, 139.) But the current of modern authorities is to the contrary. (*Treat* v. *Browning*, 4 Conn. 415; *Jones* v. *Stevens*, 11 Price, 82; *Mills et al.* v. *Spencer et al.*, 1 Holt, 53; 3 Engl. C. L. R. 177; *Inman v. Foster*, 8 Wend. 606; *Saunders* v. *Mills*, 6 Bing. 215, 220; 19 Engl. C. L. R. 104, 106; Hare & Wallace Notes, 1 Am. Leading Cases, 201, *et seq.*; Townsend on Slander and Libel, 504, *et seq.*)

These decisions proceed on the theory that public policy, the good order and repose of society, and a due regard for the protection of private character, demand that no one should be permitted to excuse or palliate the offense of defaming the reputation of another on so slight a ground as public rumor or general suspicion, which are often wholly unfounded, and the result either of malice or misapprehension. If the defendants had offered to prove, in mitigation, that the plaintiff was commonly reported and generally suspected to have been guilty of the acts imputed to him in the alleged libel, I think the proof would not have been admissible in mitigation of damages, under the rule established by the almost unbroken current of modern decisions.

Assuming that the article in the *Morning Call* related to the same transactions referred to in the publication in the *Bulletin*, it must be deemed libelous, for the reasons already

stated in respect to the article from M
and it is not pretended that the public
was founded in any degree on the inform̄ from
the *Morning Call*, or any one connected with it. On the
contrary, the defendant, Nisbet, testifies that he made an
unsuccessful effort to obtain information from that source
before the article in the *Bulletin* was written, and, failing to
obtain it in that quarter, the publication was based on the
information derived from Maynard, which was deemed en-
tirely accurate and thoroughly reliable. The article in the
*Call* performed no other office than to direct his attention to
the subject, and to stimulate further inquiry. A general
rumor on the street would have led to the same result, and
proof of the rumor would have been as admissible in miti-
gation as the publication in the *Call*, which, as here pre-
sented, can be treated in no other or more favorable light
than as a printed rumor; and, as already stated, proof of
rumors or general suspicion is not admissible in mitigation
of damages.

It is also assigned as error that the evidence did not justify
a verdict for the plaintiff; but there was some evidence tend-
ing to support the plaintiff's case, and it was the province of
the jury to weigh the testimony. We never disturb the
verdict on the ground that it was not justified by the evi-
dence when there was a substantial conflict in the testimony,
even though we may consider it to be greatly against the
weight of evidence.

We are also urged to reverse the judgment on the ground
that the damages are so grossly excessive as to raise a reason-
able presumption that the verdict was rendered under the
influence of passion or prejudice in the jury. After a care-
ful examination of the evidence, it is impossible, I think, to
resist the conclusion that the damages are for a larger sum
than the facts justified.

f of special damage, and it was satisfied that the publication was made after careful inquiry from an apparently reliable source as to the truth of the facts, and in the full belief that the publication was true. And there was not only no proof of express malice, but it was clearly shown that the defendants had no malice or ill will toward the plaintiff, and made the publication in the usual course of their business as public journalists, believing the matter to be one of special interest to the public at that time. It was, therefore, not a case calling for punitive damages. Nevertheless, the law implies that every libelous publication causes some damage to the injured party, and it is the peculiar province of the jury to estimate the amount. The Court will not interfere in such cases unless the amount awarded is so grossly excessive as to shock the moral sense, and raise a reasonable presumption that the jury was under the influence of passion or prejudice. In this case, whilst the sum awarded appears to be much larger than the facts demanded, the amount cannot be said to be so grossly excessive as to be reasonably imputed only to passion or prejudice in the jury. In such cases there is no accurate standard by which to compute the injury, and the jury must, necessarily, be left to the exercise of a wide discretion; to be restricted by the Court only when the sum awarded is so large that the verdict shocks the moral sense, and raises a presumption that it must have proceeded from passion or prejudice. As already stated, the verdict in this case is not so grossly excessive as to raise that presumption.

Judgment affirmed.