[S. F. No. 2469. Department Two.—September 24, 1903.]

## GEORGE D. GRAYBILL, Respondent, v. MICHAEL H. DE YOUNG, Appellant.

LIBEL—NEW TRIAL—EXCESSIVE - VERDICT—INSUFFICIENCY OF EVIDENCE —LACK OF SPECIFICATIONS.—A verdict for the plaintiff in an action for libel cannot be set aside as excessive, on motion for a new trial, where the statement of the case fails to specify any particulars in which it is claimed that the evidence is insufficient to justify the verdict.

ID.—LIBEL PER SE—VERDICT NOT EXCESSIVE.—Where the article pub-lished was clearly libelous *per se,* charging in effect that plaintiff was a swindler, a forger, and a double thief in a large sum, and the evidence shows that it was wholly false, and that the defendant took no pains to verify the article before publishing it, a verdict for one thousand dollars for the plaintiff was not excessive.

ID.—DELAY IN BRINGING SUIT—IMMATERIAL EVIDENCE.—The plaintiff was entitled to bring his suit under section 340 of the Code of Civil Procedure at any time within one year from the date of the publication; and an inquiry as to why he delayed suit until the day before the expiration of the year, and did not commence it sooner, was irrelevant and immaterial, and was properly excluded.

ID.—COMPLAINT OF FALSITY OF ARTICLE.—A question as to whether the plaintiff had complained in writing that the article was untrue, before commencing suit, was properly overruled; but the defendant cannot complain where he was allowed to testify without objection that no complaint of any kind, oral or written, was made before the filing of the complaint.

ID.—INSTRUCTION—EXEMPLARY DAMAGES—RESPONSIBILITY OF PROPRI-
ETOR.—An instruction that if the jury should find that the article
in question was published wantonly, recklessly, and with an utter
disregard as to whether it was true or false, the plaintiff is entitled
to recover exemplary and also compensatory damages, correctly
states the law; but where the jury were elsewhere told in effect
that nothing but compensatory damages could be allowed as against
the defendant proprietor who was absent at the time of the pub-
lication, unless they found from the evidence that in publishing
the article the defendant was actuated by malice in fact, actual or
presumed, the defendant cannot complain of the instructions given.

ID.—CIRCULATION AND INFLUENCE OF PAPER—CHARACTER AND STANDING
OF PROPRIETOR.—The court properly instructed the jury they could
consider the influence of the paper and of the defendant, and the
circulation of the paper, where its extensive circulation was an ad-
mitted fact. The greater the circulation the greater the wrong, and
the more reason why greater care should be exercised in the publi-
cation of personal items. The character and standing of the de-
fendant proprietor may be considered on the question of damages.

ID.—ACTUAL DAMAGES—SHAME AND MORTIFICATION—LOSS OF REPUTA-
TION—PLEADING—EVIDENCE—PROVINCE OF JURY.—Actual damages
for libel include shame and mortification of the plaintiff, and
loss of reputation, which need not be alleged in detail, and may be
recovered in the absence of actual proof, and to the amount that
the jury estimates will actually compensate. The jury may con-
sider the natural and necessary consequences of the publication
upon the plaintiff.

APPEAL from an order of the Superior Court of the City
and County of San Francisco denying a new trial. John
Hunt, Judge.

The facts are stated in the opinion of the court.

P. F. Dunne, and Lloyd & Wood, for Appellant.

Walter H. Linforth, and Linforth & Whitaker, for Re-
spondent.

HENSHAW, J.—This action was for libel. The trial re-
sulted in a verdict for plaintiff in the sum of one thousand
dollars. This appeal is from the order of the court denying
defendant's motion for a new trial.

It appears that one Kapus had victimized certain residents
of the city of Los Angeles, and had defrauded them out of

large sums of money by inducing them to purchase claims for
damages against the Pacific Coast Steamship Company, which
claims were wholly false and fraudulent. He represented to
his victims that through his connection with Vincent, a clerk
in the main office of the company, he was enabled to ascertain
the fact of the allowance of these claims in advance of the
claimants themselves. The time came when the men he had
defrauded demanded from Kapus some satisfactory explana-
tion as to why their money was not paid, and Kapus then
produced before them a person whom he alleged to be Vin-
cent, the clerk, and introduced him as Vincent. Thereafter
Vincent disappeared, and Kapus mournfully explained that
he had taken with him the seventy thousand dollars paid
over by the victims. One of these victims, Dr. Pepper, came
to San Francisco in pursuit of Vincent, and there learned
that no such clerk was in the employ of the company.

Such, in skeleton form, was the narrative published in the
San Francisco Chronicle, of which defendant is the pro-
prietor. The article was a despatch from the paper's Los
Angeles correspondent. It proceeded to narrate that Dr.
Pepper, describing the elusive Vincent, was told by the steam-
ship company that the description corresponded to that of
George D. Graybill, who at one time had been a clerk in their
office, but who had been discharged in 1893 or 1894. Dr.
Pepper pursued his search for Graybill, and, though failing
to find him, found a woman to whom Graybill was engaged to
be married. By her he was informed that Graybill was in
Battle Mountain, Nevada, working for the Dibbs Lumber
Company, but that he would be home the next day. The ar-
ticle proceeds:—

"Graybill did not show up the next day. On the contrary,
the woman said he had started for Utah. Dr. Pepper hunted
up the man's mother and sister to get a photograph and make
sure he was pursuing the right man, but when he announced
his name, the girl said to her mother, 'Mamma, you remem-
ber the last thing George said when he went away was, that
if Dr. Pepper called and wanted to see his picture, not to
show it to him.' This convinced the doctor that he was on
the right track, but it took some time before he could see the
photograph. He then recognized the man Kapus had intro-

duced as Vincent. Next morning the doctor attached Gray-
bill's property near North Beach, suing him and John W.
Kapus for defrauding him by means of a conspiracy. He
also set the wires to work to catch Graybill, but he has not
been caught. The disgruntled victims now propose action in
San Francisco to have Graybill declared an insolvent debtor,
and Dr. Pepper's attachment on the property dissolved. Dr.
Pepper's attorneys are ready for the move. Kapus will be
arrested on a criminal charge at an early date, if not by Dr.
Pepper, then by some one of his victims, who are fighting both
himself and Dr. Pepper.''

That the language of the article was libelous *per se* is not
disputed. It charged by implication that Graybill had im-
personated Vincent, had been a co-conspirator with Kapus in
his frauds, and, finally, had himself absconded with the
seventy-thousand-dollar fruits of their swindle, leaving
Kapus, his co-conspirator, to join his lamentations with those
of the victims.

It appears that the article was handed to Mr. Washburn,
the Los Angeles correspondent of the Chronicle, by Mr. Har-
ton, a reporter of the Los Angeles Times. Dr. Pepper resided
at Los Angeles, and Mr. Washburn knew where he lived, but
he made no endeavor to interview him in reference to the
truth or falsity of any of the statements therein contained
and attributed to Dr. Pepper. In truth, he made not the
slightest effort in any direction to verify it, his testimony in
this regard being summed up in the following question and
answer:—

''Q. In other words, when you received this story, from
whomsoever you received it, you merely boiled it down with-
out making any investigation whatever, and sent it to the
Chronicle.

''A. Certainly; that is correct.''

It was dispatched to the Chronicle about half-past ten on
the night of August 19th. It was received by the night editor,
who, because of the lateness of the hour of its arrival, took
no steps to verify the truth of any of the statements
therein contained, but caused it to be published in the next
issue of the paper. It was under these circumstances that the
publication, in effect charging Graybill with being a swindler,

a forger, and a double thief in the sum of seventy thousand dollars, was made. So far as Graybill was concerned, it was wholly untrue. He was at work in Nevada when he learned of the publication of the article, and, to use his language, "thought some job was being put up to libel or blackmail him." He gave up his position and his business chances and calculations and came to San Francisco. The article caused him a great deal of annoyance and worry.

Appellant contends that the verdict of one thousand dollars is excessive, but that question is not here a subject-matter for review. The statement of the case fails to specify any particulars in which it is claimed that the evidence is insufficient to justify the verdict of the jury. The only specifications found in the statement are specifications of errors of law. Where the statement contains no such specifications it must be disregarded on the hearing of the motion. (Code Civ. Proc., sec. 659, subd. 3; *Kyle* v. *Craig*, 125 Cal. 116.)

The ground of the motion that excessive damages appear to have been given under the influence of passion or prejudice is but another form of saying that the evidence does not justify the verdict. (*Harrison* v. *Sutter-Street Ry. Co.*, 116 Cal. 162; *Doolin* v. *Omnibus Cable Co.*, 125 Cal. 144.) In the latter case it is said: "To say that a verdict for damages was enhanced by passion or prejudice is one mode of saying that the evidence did not justify it; and the only means of discovering therein the element of passion or prejudice, within the meaning of the statute, is by comparing the amount with the evidence which was before the court at the trial."

But, aside from this, if consideration be paid to the evidence, it cannot be said under the circumstances that the damages awarded were excessive. (*Wilson* v. *Fitch*, 41 Cal. 363, 386; *Harris* v. *Zanone*, 93 Cal. 71; *Gilman* v. *McClatchy*, 111 Cal. 606; *Taylor* v. *Hearst*, 118 Cal. 366, 368; *Sanderson* v. *Caldwell*, 45 N. Y. 403.[1])

Certain rulings of the court in admitting and rejecting testimony are complained of. Plaintiff was asked if it was not a fact that he did not bring this suit until the day the cause of action was about to outlaw. The court sustained an objection to the question. If the fact were pertinent in evidence at

[1] 6 Am. Rep. 105.

all, the record as disclosed by the complaint in the action was the best evidence. The plaintiff was also asked why he did not bring the suit until the day before the action was about to outlaw. Objection to this was sustained. By section 340 of the Code of Civil Procedure plaintiff was given a year within which to commence the action, and the inquiry as to why he did not commence it sooner was irrelevant and immaterial. In *Tribune Association* v. *Follwell,* 107 Fed. 646, the ruling of the court of appeals decided that evidence to the point that plaintiff had never demanded a retraction was irrelevant and immaterial. So too must be evidence addressed to the private reasons of the plaintiff as to why his suit, admittedly commenced in time, was not begun earlier. But, moreover, before the taking of testimony was closed, plaintiff's attorney withdrew his objection and offered to allow the witness to answer; but the offer was refused. Plaintiff was asked if he had ever made any complaint in writing to the defendant that the article, or any of it, was untrue before commencing suit, and the court sustained an objection to this question. The ruling was proper under the authority of the case last cited, but, in addition, the defendant had the benefit of uncontradicted testimony upon this point, in that he was allowed to testify without objection that no protest of any kind, oral or in writing, concerning the publication was made prior to the filing of the complaint in this action.

Objection is made of certain instructions proposed by the defendant and refused by the court. The matter of these instructions is covered by the charge which the court actually gave, and which was very full. The court charged: "If you should find that the article in question was published wantonly, recklessly, and with an utter disregard as to whether it was true or false, then I charge you the plaintiff is entitled to recover exemplary and also compensatory damages." This instruction is complained of. Within its limitations it certainly correctly states the law. (*Turton* v. *New York Recorder Co.,* 144 N. Y. 144; *Morey* v. *Morning Journal Assn.,* 123 N. Y. 207;[1] *Turner* v. *Hearst,* 115 Cal. 401; *Taylor* v. *Hearst,* 118 Cal. 366.) But Mr. De Young, being absent in Europe at the time of the publication, and knowing nothing

---

[1] 20 Am. St. Rep. 730.

about it, and not having inspired it in any way, it is said that it violates what is asserted to be the rule in this state, that the employer is not responsible in punitive damages for the wanton negligence or malicious acts of his servants, in support of which proposition are cited the cases of *Warner* v. *Southern Pacific Co.,* 113 Cal. 105,[1] and *Trabing* v. *California Navigation etc. Co.,* 121 Cal. 137.

Elsewhere the authorities are numerous that even where the proprietor is in ignorance of the publication he may be cast in punitive damages if the circumstances of and concerning the publication justify it. (*Malloy* v. *Bennett,* 15 Fed. 371; *O'Brien* v. *Bennett,* 59 App. Div. 623; 69 N. Y. Supp. 298; *Dunn* v. *Hall,* 1 Ind. 344; *Smith* v. *Utley,* 92 Wis. 133; *Buckley* v. *Knapp,* 48 Mo. 152; *Goodrich* v. *Stone,* 11 Met. 486; *Bruce* v. *Reed,* 104 Pa. St. 408.[2])

But, apart from this, attack is made upon a detached portion of the instructions covering the point. The language here employed is general, and is but designed to state the general proposition of law as to the circumstances under which punitive damages may be permitted. Elsewhere, and repeatedly, the jury were told, in effect, that nothing but compensatory damages could be allowed unless they found from the evidence that in publishing the article, "the defendant, Mr. De Young, was actuated by malice in fact, actual or presumed."

It is contended as to other instructions that they were misleading because without the evidence in the case. This criticism is made of the instruction relating to the influence of the paper and of the defendant, and of the circulation of the paper. As to the law touching these matters it is said (*Gilman* v. *McClatchy,* 111 Cal. 614): "The greater the circulation the greater the wrong, and the more reason why greater care should be exercised in the publication of personal items." As to the standing and influence of the defendant himself, in *Broughton* v. *McGrew,* 39 Fed. 672, in an action for slander, the court charged the jury: "The character of the defendant himself, his standing in the community, is a matter which you may consider in determining the amount of damages. A man of high character, of known force and influence in the

---

[1] 54 Am. St. Rep. 327.        [2] 49 Am. Rep. 586.

community, may injure another by talking about him more than a man of less character would." As to the evidence itself, it was an admitted fact in the case, pleaded, and not denied, that for a long time prior to the publication, and ever since, the Chronicle had been widely and extensively circulated daily, not only in the city of San Francisco, but throughout the entire state of California, and that at the time of the publication in question its circulation exceeded sixty-eight thousand copies daily, and that the publication containing the libel was widely circulated among and read by the people not only of the city of San Francisco, but throughout the entire state of California and elsewhere.

Complaint is also made of the fact that the instructions charged the jury that loss of reputation, shame, mortification, and injury to feelings are proper elements of actual damage, and it is said that "There was not only no evidence as to shame or mortification suffered by plaintiff, but none is alleged in the complaint." In the complaint it is averred that the publication inflicted upon plaintiff grievous mental suffering, in consequence of which he was greatly injured in his good name and character. Shame and mortification are elements of, and may constitute, grievous mental suffering, and are likewise elements of actual damage. Thus in *Childers* v. *San José Mercury etc. Co.*, 105 Cal. 288,[1] it is said: "Two classes of damages may be recovered in actions of libel, to wit, actual or compensatory damages and exemplary damages. Special damages as a branch of actual damages may be recovered when actual pecuniary loss has been sustained, and is specially pleaded. *The remaining branch of actual damages embraces recovery for loss of reputation, shame, mortification, injury to feelings, etc.*, and while special damages must be alleged and proven, *general damages for outrage to feelings and loss of reputation need not be alleged in detail, and may be recovered in the absence of actual proof;* and to the amount that the jury estimates will fairly compensate. (*Wilson* v. *Fitch*, 41 Cal. 363, 386.)"

The jury was told that in estimating damages they had a right to consider the natural and necessary consequences of such publication upon the plaintiff. This instruction was strictly within the law. (*Fry* v. *Bennett*, 3 Bosw. 246.)

---

[1] 45 Am. St. Rep. 40.

There thus appears to have been no error in the rulings or the instructions of the court, and the order appealed from is therefore affirmed.

McFarland, J., and Lorigan, J., concurred.