[L. A. No. 21132. In Bank. Apr. 14, 1950.]

ERWIN P. WERNER, Appellant, v. SOUTHERN CALIFORNIA ASSOCIATED NEWSPAPERS (a Corporation), Respondent.

Morris Lavine for Appellant.

William C. Ring as Amicus Curiae on behalf of Appellant.

O'Melveny & Myers, Louis W. Myers, Sidney H. Wall and Pierce Works for Respondent.

Price, MacDonald & Knox, Harry L. Price, Calkins, Hall, Linforth & Conard, Reginald H. Linforth, Cooper, White & Cooper, George A. Helmer, John Hamlyn, Cosgrove, Clayton, Cramer & Diether, T. B. Cosgrove, Binford & Binford, How-

ard Binford, Lawler, Felix & Hall, John Hall, Flint & Mac-Kay, H. S. MacKay, Jr., Edward L. Compton, McEnerney & Jacobs, Garret McEnerney II and Stephen W. Downey, Amici Curiae on behalf of Respondent.

TRAYNOR, J.—Plaintiff appeals from a judgment of dismissal of his action for libel, entered upon his failure to amend his complaint after a demurrer thereto had been sustained. Plaintiff alleged in his complaint that defendant published in its newspapers false charges that he had been convicted of a felony and sentenced to prison therefor, that the falsity of these charges was known or should have been known to defendant, and that defendant published the charges with intent to injure, disgrace, and defame him. Defendant's demurrer was sustained on the ground that plaintiff did not allege that he had complied with the provisions of Civil Code section 48a* or that he suffered special damage as a result

---

*"1. In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast, plaintiff shall recover no more than special damages unless a correction be demanded and be not published or broadcast, as hereinafter provided. Plaintiff shall serve upon the publisher, at the place of publication or broadcaster at the place of broadcast, a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. Said notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous.

"2. If a correction be demanded within said period and be not published or broadcast in substantially as conspicuous a manner in said newspaper or on said broadcasting station as were the statements claimed to be libelous, in a regular issue thereof published or broadcast within three weeks after such service, plaintiff, if he pleads and proves such notice, demand and failure to correct, and if his cause of action be maintained, may recover general, special and exemplary damages; provided that no exemplary damages may be recovered unless the plaintiff shall prove that defendant made the publication or broadcast with actual malice and then only in the discretion of the court or jury, and actual malice shall not be inferred or presumed from the publication or broadcast.

"3. A correction published or broadcast in substantially as conspicuous a manner in said newspaper or on said broadcasting station as the statements claimed in the complaint to be libelous, prior to receipt of a demand therefor, shall be of the same force and effect as though such correction had been published or broadcast within three weeks after a demand therefor.

"4. As used herein, the terms 'general damages,' 'special damages,' 'exemplary damages' and 'actual malice,' are defined as follows:

"(a) 'General damages' are damages for loss of reputation, shame, mortification and hurt feelings;

"(b) 'Special damages' are all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other. . . ."

of the publication. Plaintiff contends that section 48a is unconstitutional.

 Article I, section 9 of the California Constitution provides: "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. . . ." Plaintiff contends that under this section a person who defames another must be fully responsible for any damage caused thereby, and that the substitution of a retraction for all but special damages is an unconstitutional attempt to relieve newspapers and radio stations from full responsibility for the abuse of the right of free speech. Defendant contends that the abuse clause of section 9 does not confer on a person defamed a right to the remedy of damages, but merely specifies that the constitutional right of free speech does not automatically carry with it freedom from responsibility for such abuses as were recognized by the common law or defined by the Legislature. We agree with defendant's contention. To hold otherwise would result in freezing the law of defamation as it was when the constitutional provision was originally adopted in 1849.

The quoted provision is an almost exact duplicate of article VII, section 8 of the New York Constitution of 1821. Substantially the same language is found in the constitutions of 43 states. (Chafee, Free Speech in the United States, p. 5, n. 2.) The remaining states have a shorter guaranty similar to that in the United States Constitution, in which the "abuse" exception has been necessarily implied. (See *Schenck* v. *United States*, 249 U.S. 47, 52 [39 S.Ct. 247, 63 L.Ed. 470].) In none of these jurisdictions has the provision been construed as freezing the law of defamation as of the date of its adoption. Indeed, its primary purpose is to guarantee that freedom of speech shall not be restrained except to prevent abuse.

Since 1872 the Legislature has consistently acted on the principle that it is free to change the law of defamation. Many of the amendments have limited or abolished remedies theretofore available to persons defamed. Thus before 1945, the year of enactment of section 48a as presently worded, the Legislature had extended the absolute privilege with respect to statements in judicial, legislative, and other official proceedings, and the qualified privilege with respect to reports of such proceedings (Code Amendments 1873-1874, p. 184); it had extended the qualified privileges of section 47 of the Civil Code to fair and true reports of public meetings (Stats.

1895, p. 168); it had enacted the original version of section 48a limiting the liability of newspapers, when the publication was made without malice through misinformation and mistake, and a retraction was demanded and published. (See *San Francisco* v. *Industrial Acc. Com.,* 183 Cal. 273, 279 [191 P. 26].) As early as 1886 this court recognized the power of the Legislature to extend absolute privileges and thus abolish all remedies for defamation in certain situations. (*Hollis* v. *Meux,* 69 Cal. 625, 629 [11 P. 248, 58 Am.Rep. 574].) Moreover, the courts have invoked the applicable code sections as amended to determine the rights of the parties without in any way intimating that the Legislature was powerless to reduce the remedies available at common law for defamation. (*Harris* v. *Zanone,* 93 Cal. 59, 70 [28 P. 845]; *Ball* v. *Rawles,* 93 Cal. 222, 236 [28 P. 937, 27 Am.St.Rep. 174]; *Gosewisch* v. *Doran,* 161 Cal. 511, 513-514 [119 P. 656, Ann.Cas. 1913D 442]; *Brewer* v. *Second Baptist Church,* 32 Cal.2d 791, 799 [197 P.2d 713]; *Behrendt* v. *Times-Mirror Co.,* 30 Cal.App. 2d 77, 88 [85 P.2d 949]; *Harris* v. *Curtis Publishing Co.,* 49 Cal.App.2d 340, 349, 353 [121 P.2d 761].) Given the view that the Legislature has taken of its own powers with regard to the law of defamation and the courts' acceptance of that view, it is clear that the abuse clause of the Constitution was intended, not to guaranty a remedy to those injured, but only to make clear that the right of free speech does not guaranty immunity from liability to those who abuse it. (See *County of Los Angeles* v. *Southern Cal. Tel. Co.,* 32 Cal.2d 378, 392 [196 P.2d 773].) Accordingly, section 48a of the Civil Code is not rendered invalid by section 9 of article I of the California Constitution.

It is also clear that section 48a is not invalid under the due process clause of the United States Constitution. "Except as the Constitution otherwise provides, the Legislature has complete power to determine the rights of individuals. (See *Delaney* v. *Lowery,* 25 Cal.2d 561, 568 [154 P.2d 674].) It may create new rights or provide that rights which have previously existed shall no longer arise, and it has full power to regulate and circumscribe the methods and means of enjoying those rights, so long as there is no interference with constitutional guaranties." (*Modern Barber Col.* v. *California Emp. Stab. Com.,* 31 Cal.2d 720, 726 [192 P.2d 916].) ". . . the Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common

law, to attain a permissible legislative object." (*Silver* v. *Silver*, 280 U.S. 117, 122 [50 S.Ct. 57, 74 L.Ed. 221] ; *Langdon* v. *Sayre*, 74 Cal.App.2d 41 [168 P.2d 57].)

There are at least two bases on which the Legislature could reasonably conclude that the retraction provisions of section 48a provide a reasonable substitute for general damages in actions for defamation against newspapers and radio stations, namely, the danger of excessive recoveries of general damages in libel actions and the public interest in the free dissemination of news.

General damages are allowed for "loss of reputation, shame, mortification and hurt feelings" (Civ. Code, § 48a), but the extent of such injuries is difficult to determine. At common law it was conclusively presumed that general damages resulted from the publication of a libel. "The practical result is that the jury may award not only nominal damages, but substantial sums in compensation of the supposed harm to the plaintiff's reputation, without any proof that it has in fact occurred." (Prosser, Torts, § 92, p. 797.) The Legislature could reasonably conclude that recovery of damages without proof of injury constitutes an evil.

It is settled that the Legislature may attack the evils of unfounded litigation by abolishing causes of action altogether. Thus statutes abolishing civil actions for alienation of affection, criminal conversation, seduction and breach of promise to marry have generally been upheld. (*Langdon* v. *Sayre*, 74 Cal.App.2d 41 [168 P.2d 57] ; see, anno. 158 A.L.R. 617, and cases cited.) The purpose of such legislation has been stated by the New York Legislature as follows: "The remedies heretofore provided by law for the enforcement of actions based upon [alleged] alienation of affections, criminal conversation, seduction and breach of contract to marry, having been subjected to grave abuses, causing extreme annoyance, embarrassment, humiliation and pecuniary damage to many persons wholly innocent and free of any wrongdoing, who were merely the victims of circumstances, and such remedies having been exercised by unscrupulous persons for their unjust enrichment, and such remedies having furnished vehicles for the commission or attempted commission of crime and in many cases having resulted in the perpetration of frauds, it is hereby declared as the public policy of the state that the best interests of the people of the state will be served by the abolition of such remedies." (Civil Practice Act, §§ 61-a et seq.) Similarly it has been held that the dangers

of unfounded actions based on negligence justify legislative abolition of certain classes of such actions. "We are not unaware of the increasing frequency of litigation in which passengers carried gratuitously in automobiles, often casual guests or licensees, have sought the recovery of large sums for injuries alleged to have been due to negligent operation. . . . Whether there has been a serious increase in the evils of vexatious litigation in this class of cases, where the carriage is by automobile, is for legislative determination and, if found, may well be the basis of legislative action further restricting the liability. Its wisdom is not the concern of courts." (*Silver* v. *Silver*, 280 U.S. 117, 122-123 [50 S.Ct. 57, 74 L.Ed. 221]; see also, anno., 111 A.L.R. 1011, and cases cited.)

These cases involved the danger of imposing liability when there had been no wrong. The same principles are applicable to the danger of imposing excessive liability when no actual damages have been proved. Moreover, in the common law of slander, as distinct from libel, there is ample precedent for denying any recovery unless special damages are proved. "All other slanderous words, no matter how grossly insulting or defamatory they may be, which cannot be fitted into the arbitrary categories listed above [imputation of a serious crime or a loathsome disease or affecting plaintiff in his business, trade, profession or office], are actionable only upon proof of 'special' damage—special in the sense that it must be supported by specific proof, as distinct from the 'general' damage presumed to follow in the case of libel or the kinds of slander already considered." (Prosser, Torts, § 92, p. 805.) Although this distinction between libel and slander has been attacked as the irrational result of historical accident, "one reason that the law has remained as it stands is that there is violent dispute as to the direction in which it should move. Assuming that the distinction between libel and slander is a thing without reason and to be abandoned, at least four proposals have been made as to the basis on which the two might be united [only the first two are quoted here]:

"1. To require, in all cases, proof of actual damage as essential to the existence of a cause of action. This suggestion, of course, has been a popular one with publishers. It undoubtedly would do away with the serious evil of the abuse of the action of defamation as a weapon of extortion; but it is open to the important objection that proof of actual dam-

age is impossible in many cases where, from the character of the defamatory words and the circumstances of publication, it is almost certain that it must have occurred.''

''2. To make all defamation, oral or written, actionable without proof of damage. This, in substance, is the present law of Louisiana, where it seems to be administered without undue difficulty. Opposed to this is the obvious argument that much defamatory language, particularly in the case of hasty spoken words, is trivial, harmless, and unworthy of redress; that the opportunities for extortion would be vastly increased; and that in the interest of freedom of speech some safety-valve must be left open for the expression of unflattering views.'' (Prosser, Torts, § 92, pp. 808-809.)

In view of the conflicting rules of liability presented by the law of defamation itself and the recognition in other situations that the Legislature may abolish causes of action to prevent unfounded litigation, we cannot say that the Legislature could not reasonably conclude that the danger of excessive recoveries of general damages in libel actions justified limitation of recovery to special damages when a retraction has not been demanded and refused.

Nor can we take exception to the second basis upon which the Legislature could justify its limitation of recovery to special damages, namely, the public interest in the free dissemination of news. In view of the complex and far-flung activities of the news services upon which newspapers and radio stations must largely rely and the necessity of publishing news while it is new, newspapers and radio stations may in good faith publicize items that are untrue but whose falsity they have neither the time nor the opportunity to ascertain. The Legislature may reasonably conclude that the public interest in the dissemination of news outweighs the possible injury to a plaintiff from the publication of a libel, and may properly encourage and protect news dissemination by relieving newspapers and radio stations from all but special damages resulting from defamation, upon the publication of a retraction. (See *Allen* v. *Pioneer Press Co.*, 40 Minn. 117, 120 [41 N.W. 936, 12 Am.St.Rep. 707, 3 L.R.A. 532]; Hall, *Preserving Liberty of the Press by the Defense of Privilege in Libel Actions*, 26 Cal.L.Rev. 226.) Plaintiff contends, however, that no public interest is served by the publication of false news and that it is desirable to enforce full responsibility as a deterrent to careless or malicious publication. He contends that the statute was enacted, not to encourage dissemination of

news or to lessen the evils of excessive recoveries, but to grant newspapers and radio stations special privileges.

Certainly there are forceful arguments in favor of the policy plaintiff advocates. (See Morris, *Inadvertent Newspaper Libel and Retraction*, 32 Ill.L.Rev. 36, 45; Paton, *Reform and the English Law of Defamation*, 33 Ill.L.Rev. 669.)

It is for the Legislature, however, to choose between conflicting policies, and this court may not presume that in reaching its decision it acted upon improper motives. ". . . a judiciary must judge by results, not by the varied factors which may have determined legislators' votes. We cannot undertake a search for motive in testing constitutionality." (*Daniel* v. *Family Secur. L. Ins. Co.*, 336 U.S. 220, 224 [69 S.Ct. 550, 93 L.Ed. 632, 10 A.L.R.2d 945]; *Goesaert* v. *Cleary*, 335 U.S. 464, 466-467 [69 S.Ct. 198, 93 L.Ed. 163].)

This court cannot invoke the due process clause to invalidate a legislative policy that it may deem unwise without exercising judicial censorship directed not at the constitutionality of legislation but at its wisdom, a censorship whose dangers Mr. Justice Holmes clearly envisaged: "I have not yet adequately expressed the more than anxiety that I feel at the ever increasing scope given to the Fourteenth Amendment in cutting down what I believe to be the constitutional rights of the States. As the decisions now stand, I see hardly any limit but the sky to the invalidating of those rights if they happen to strike a majority of this Court as for any reason undesirable. I cannot believe that the Amendment was intended to give us *carte blanche* to embody our economic or moral beliefs in its prohibitions." (*Baldwin* v. *Missouri*, 281 U.S. 586, 595 [50 S.Ct. 436, 74 L.Ed. 1056], dissent.) This view has found increasing acceptance by the United States Supreme Court. "This Court beginning at least as early as 1934 when the *Nebbia* case was decided, has steadily rejected the due process philosophy enunciated in the *Adair-Coppage* line of cases. In doing so it has consciously returned closer and closer to the earlier constitutional principle that states have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law. [Citations.] Under this constitutional doctrine the due process clause is no longer to be so broadly construed that the Congress and state legislatures are put in a strait jacket when they

attempt to suppress business and industrial conditions which they agreed as offensive to the public welfare." (*Lincoln Fed. L. Union* v. *Northwestern I. & M. Co.*, 335 U.S. 525, 536-537 [69 S.Ct. 251, 93 L.Ed. 212, 6 A.L.R.2d 473].)

"Despite evidence to the contrary, respondents see no evil to be corrected by this legislation. We are asked to agree with respondents and call the statute arbitrary and unreasonable.

"Looking through the form of this plea to its essential basis, we cannot fail to recognize it as an argument for invalidity because this Court disagrees with the desirability of the legislation. We rehearse the obvious when we say that our function is thus misconceived. We are not equipped to decide desirability; and a court cannot eliminate measures which do not happen to suit its tastes if it seeks to maintain a democratic system. The forum for the correction of ill-considered legislation is a responsive legislature." (*Daniel* v. *Family Secur. L. Ins. Co.*, 336 U.S. 220, 224 [69 S.Ct. 550, 93 L.Ed. 632, 10 A.L.R.2d 945].)

The responsiveness of a legislature reflects the alertness of the electorate, and legislation ill-considered in a climate of indifference may continue to flourish in such a climate to the dismay of interested citizens whose numbers may be small. If these few then turn impatiently to the courts, however, abandoning the hard task of dispelling the general lethargy, they accomplish nothing to improve legislation, for if courts are called upon to set their judgment as to what is wise against the popular judgment they may summarily put an end to certain laws that may be foolish but also to certain laws that may be wise, and particularly to laws that may be wise in the long run although they appear foolish at the moment. "Most laws dealing with economic and social problems are matters of trial and error. That which before trial appears to be demonstrably bad may belie prophesy in actual operation. It may not prove good, but it may prove innocuous. But even if a law is found wanting on trial, it is better that its defects should be demonstrated and removed than that the law should be aborted by judicial fiat. Such an assertion of judicial power deflects responsibility from those on whom in a democratic society it ultimately rests—the people." (Mr. Justice Frankfurter concurring in *A.F.L.* v. *American Sash & D. Co.*, 335 U.S. 538, 553 [69 S.Ct. 258, 93 L.Ed. 222, 6 A.L.R.2d 481].)

Plaintiff then contends that section 48a violates the equal

protection clause of the United States Constitution and section 25 of article IV of the California Constitution in granting to newspapers and radio stations privileges denied to others, thus depriving plaintiffs defamed by newspapers or radio stations of rights enjoyed by plaintiffs defamed by others. These provisions were recently reconsidered in *County of Los Angeles* v. *Southern Cal. Tel. Co.*, 32 Cal.2d 378 [196 P.2d 773], where the court said in quoting from *People* v. *Western Fruit Growers*, 22 Cal.2d 494 [140 P.2d 13], " 'Problems of classification under the California Constitution are thus similar to those presented by the federal equal protection of the laws clause of the 14th Amendment. Under either provision, the mere production of inequality which necessarily results to some degree in every selection of persons for regulation does not place the classification within the constitutional prohibition. The discrimination or inequality produced, in order to conflict with the constitutional provisions, must be "actually and palpably unreasonable and arbitrary," or the legislative determination as to what is a sufficient distinction to warrant the classification will not be overthrown. [Citations.] When a legislative classification is questioned, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of existence of that state of facts, and the burden of showing arbitrary action rests upon the one who assails the classification.' (22 Cal.2d 494, 506.)'' (32 Cal.2d 378, 390.)

A classification is reasonable, however, only if there are differences between the classes and the differences are reasonably related to the purposes of the statute. (*Accounting Corp.* v. *State Bd. of Accountancy*, 34 Cal.2d 186, 190 [208 P.2d 984], and cases cited; see Tussman and ten Broek, *The Equal Protection of the Laws*, 37 Cal.L.Rev. 341, 346.) "As a matter of principle and in view of my attitude toward the equal protection clause, I do not think differences of treatment under law should be approved on classification because of differences unrelated to the legislative purpose. The equal protection clause ceases to assure either equality or protection if it is avoided by any conceivable difference that can be pointed out between those bound and those left free. This Court has often announced the principle that the differentiation must have an appropriate relation to the object of the legislation or ordinance. See, for example, *Mayflower Farms* v. *Ten Eyck*, 297 U.S. 266 [56 S.Ct. 457, 80 L.Ed. 675];

*Smith* v. *Cahoon*, 283 U.S. 553 [51 S.Ct. 582, 75 L.Ed. 1264]. In the latter case a motor vehicle regulation was struck down upon citation of many authorities because 'such a classification is not based on anything having relation to the purpose for which it is made.' 283 U.S. 553, 567. If that were the situation here, I should think we should reach a similar conclusion." (Mr. Justice Jackson, concurring in *Railway Express Agency* v. *New York*, 336 U.S. 106, 115 [69 S.Ct. 463, 93 L.Ed. 533].) It is therefore necessary to determine whether the classification of newspapers and radio stations apart from others bears a reasonable relationship to the objectives the Legislature sought to achieve by enacting section 48a.

It is contended that if the statute is designed to eliminate the danger of recoveries of excessive general damages, it is too narrow in that it does not attack the danger generally but only in litigation against newspapers and radio stations. Conversely, it is contended that if it is designed to encourage the free dissemination of news, it is too broad in that its protection is extended not only to those who may in good faith disseminate defamatory material but also to those who disseminate deliberate and malicious falsehoods. There are persuasive analogies, however, that support the validity of the classification in either case.

Certainly a statute cannot be limited to a specific class without reason. (*Missouri, Kansas & Texas Ry. Co.* v. *May*, 194 U.S. 267, 269 [24 S.Ct. 638, 48 L.Ed. 971]; *cf.*, *Del Mar Canning Co.* v. *Payne*, 29 Cal.2d 380 [175 P.2d 231], with *Ferrante* v. *Fish & Game Commission*, 29 Cal.2d 365 [175 P.2d 222].) The Legislature could reasonably conclude that defamation suits against newspapers and radio stations constituted the most conspicuous example of the danger it sought to preclude. It is not prohibited by the equal protection clause from striking the evil where it is felt most. (*Goesaert* v. *Cleary*, 335 U.S. 464, 466 [69 S.Ct. 198, 93 L.Ed. 163]; *Railway Express Agency* v. *New York*, 336 U.S. 106, 110 [69 S.Ct. 463, 93 L.Ed. 533].) In considering an analogous situation involving legislation limiting the right to recover damages for negligence the United States Supreme Court said, ". . . there is no constitutional requirement that a regulation, in other respects permissible, must reach every class to which it might be applied—that the legislature must be held rigidly to the choice of regulating all or none. [Citations.] In this day of almost universal highway transportation by motor car, we cannot say that abuses originating in the multi-

plicity of suits growing out of the gratuitous carriage of passengers in automobiles do not present so conspicuous an example of what the legislature may regard as an evil, as to justify legislation aimed at it, even though some abuses may not be hit. [Citations.] It is enough that the present statute strikes at the evil where it is felt and reaches the class of cases where it most frequently occurs." (*Silver* v. *Silver*, 280 U.S. 117, 123-124 [50 S.Ct. 57, 74 L.Ed. 221].) Similarly in this case, we cannot say that the Legislature could not reasonably conclude that because of the business they are engaged in, newspapers and radio stations are the most frequent objects of defamation actions and that the danger of excessive damages in actions against them is greatest because of their reputed ability to pay. See, Morris, *Inadvertent Newspaper Libel and Retraction*, 32 Ill.L.Rev. 36, 43; *cf.*, *Packard* v. *Moore*, 9 Cal.2d 571, 578-580 [71 P.2d 922], discussing rule of inadmissibility of evidence that defendant is insured in personal injury actions.)

Moreover, in balancing the danger of recoveries of excessive general damages against leaving plaintiffs with no effective remedy for injury to their reputations, the Legislature could properly take into consideration the fact that a retraction widely circulated by a newspaper or radio station would have greater effectiveness than a retraction by an individual and could thus class newspapers and radio stations apart. "Now, as far as vindication of character or reputation is concerned, it stands to reason that a full and frank retraction of the false charge, especially if published as widely and substantially to the same readers as was the libel, is usually in fact a more complete redress than a judgment for damages." (*Allen* v. *Pioneer Press Co.*, 40 Minn. 117, 124 [41 N.W. 936, 12 Am.St.Rep. 707, 3 L.R.A. 532].) ". . . exculpation in the eyes of the world is not accomplished by quiet entry of a judgment on the musty rolls of a court. The judgment must be publicized, if those who have read the libel are to know of its adjudged falsity. Unless the community is both small and interested, so that news of the judgment is spread throughout it verbally, the plaintiff's vindication depends upon the mercy of the press. The vanquished defendant may not mention the judgment. Even his competitors—if he has any—may keep silent, out of fear of advertising a weapon which may be used against them when next they boggle." (Morris, *Inadvertent Newspaper Libel and Retraction*, 32 Ill.L.Rev. 36, 38.)

The Legislature can make a classification for the purpose of applying a statute, not to the group classified, but to everyone except that group. Thus a Michigan statute prohibits females from acting as bartenders unless they are the wives or daughters of male owners of bars. In upholding this statute the Supreme Court said, "Since bartending by women may, in the allowable legislative judgment, give rise to moral and social problems against which it may devise preventive measures, the legislature need not go the full length of prohibition if it believes that as to a defined group of females other factors are operating which either eliminate or reduce the moral and social problems otherwise calling for prohibition. Michigan evidently believes that the oversight assured through ownership of a bar by a barmaid's husband or father minimizes hazards that may confront a barmaid without such protecting oversight. This court is certainly not in a position to gainsay such belief by the Michigan legislature. If it is entertainable, as we think it is, Michigan has not violated its duty to afford equal protection of its laws. We cannot cross-examine either actually or argumentatively the mind of Michigan legislators nor question their motives. Since the line they have drawn is not without a basis in reason, we cannot give ear to the suggestion that the real impulse behind this legislation was an unchivalrous desire of male bartenders to try to monopolize the calling." (*Goesaert* v. *Cleary*, 335 U.S. 464, 466-467 [69 S.Ct. 198, 93 L.Ed. 163].) Thus the equal protection clause did not require Michigan to exclude all women or none from bartending, for the reasons for exclusion were not so compelling for one group as for the others. Similarly, in this case, the Legislature could stop short of substituting a retraction for general damages in all cases, because it could reasonably conclude that in those cases where it did so provide a retraction would be a more effective substitute than in those cases the statute does not reach.

Section 48a may also be sustained under the equal protection clause on the theory that its purpose is to encourage the dissemination of news. Although it extends its protection to those who may deliberately and maliciously disseminate libels, the Legislature could reasonably conclude that it was necessary to go so far effectively to protect those who in good faith and without malice inadvertently publish defamatory statements. The argument that the statute denies equal protection of the laws because it goes too far is substantially

akin to the argument that it violates the due process clause and is equally specious. The legislation abolishing heart-balm suits, for example, was designed, not to protect those who deliberately or maliciously alienated the affection of one spouse for another, but to insure that innocent defendants will not be sued. Again, guest statutes were designed not to protect negligent drivers but to insure that innocent drivers will not be subjected to the hazards of a trial with the possibility of an erroneous conclusion on the facts. There are many examples in the law of defamation in which the defendant's state of mind, his intent, or his negligence is immaterial to the question of liability. Thus, absolute privilege exemplifies the belief that in some case the public interest in freedom of expression outweighs the harm that may be done to the persons defamed. (See, Prosser, Torts, § 94, p. 823; Civ. Code, § 47(1), (2), (4), (5).) ''The rule exists, not because the malicious conduct of such persons ought not to be actionable, but because, if their conduct were actionable, actions would be brought against them in cases in which they had not spoken falsely and maliciously; it is not a desire to prevent actions from being brought in cases where they ought to be maintained, but the fear that if the rule were otherwise, numerous actions would be brought against persons who were acting honestly in the discharge of a duty. It may be urged, of course, that a false statement, known to be untrue, and dictated by malice, should always be the subject of a civil remedy. But this bald method of stating the question assumes both the untruth and the malice. If by any process of demonstration, free from the defects of human judgment, the untruth and malice could be set above and beyond all question of doubt, there might be ground for contending that the law should give damages to an injured person. But this is not the state of things under which this question of law has to be determined. Whether statements were in fact untrue, and whether they were dictated by malice, are, and always will be, open questions, upon which opinions may differ, and which can only be resolved by the exercise of human judgment. And the real question is whether it is proper on grounds of public policy to remit such questions to the judgment of a jury. The reasons against doing so are simple and obvious. A participant in judicial proceedings may be utterly free from malice, and yet in the eyes of a jury be open to that imputation; or he may be cleared by the jury of the imputa-

tion, and may yet have to encounter the expense and distress of a harassing litigation. With such possibilities hanging over his head, he cannot be expected to speak with that free and open mind which the administration of justice demands." (Veeder, *Absolute Immunity in Defamation,* 9 Columb.L.Rev. 463, 469-470.)

 Conversely, when the primary interest is regarded as being that of the plaintiff in his reputation, strict liability has been imposed. (See, Prosser, Torts, § 93, p. 816, and cases cited.) This imposition of liability without fault, even in cases where actual damage appears doubtful (see, e. g., *Hulton & Co.* v. *Jones* [1909], 2 K.B. 44, aff'd [1910], A.C. 20), has been forcefully defended on the grounds that "Any attempt by the law to distinguish between the motives of those who defame others would make the rules too intricate and provide too many possibilities of escape" (Paton, *Reform and the English Law of Defamation,* 33 Ill.L.Rev. 669, 670), and that it is necessary to impose strict liability effectively to discourage negligent and intentional libels. (See, Morris, *Inadvertent Newspaper Libel and Retraction,* 32 Ill.L.Rev. 36, 45; *cf., In re Marley,* 29 Cal.2d 525 [175 P.2d 832].)

Thus in cases both of absolute privilege and strict liability the importance of protecting one interest or another has been considered sufficient to justify the broadest immunity or liability to insure the desired immunity or liability. This court is not in a position to weigh the relative importance of the conflicting interests involved, and even if it were it should not attempt to do so. "Courts can fulfill their responsibility in a democratic society only to the extent that they succeed in shaping their judgments by rational standards, and rational standards are both impersonal and communicable. Matters of policy, however, are by definition matters which demand the resolution of conflicts of value, and the elements of conflicting values are largely imponderable. Assessment of their competing worth involves differences of feelings; it is also an exercise in prophecy. Obviously the proper forum for mediating a clash of feelings and rendering a prophetic judgment is the body chosen for those purposes by the people. Its function can be assumed by this Court only in disregard of the historic limits of the Constitution." (Mr. Justice Frankfurter, concurring in *A.F.L.* v. *American Sash & D. Co.,* 335 U.S. 538, 557 [69 S.Ct. 258, 93 L.Ed. 222, 6 A.L.R.2d 481].)

We cannot say that in balancing the interests of defamed

plaintiffs against the interests of the public in the dissemination of news or the avoidance of the dangers of excessive general damages, the Legislature reached an unconstitutional compromise in enacting section 48a.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Spence, J., concurred.

CARTER, J.—I dissent.

From the writings of the world's wisest men we have the assurance "that a good name is rather to be chosen than great riches," Proverbs XXII:1; and

"Good name in man and woman, dear my lord,
Is the immediate jewel of their souls;
Who steals my purse steals trash; 'tis something, nothing;
'Twas mine, 'tis his, and has been slave to thousands;
But he that filches from me my good name,
Robs me of that which not enriches him,
And makes me poor indeed."

(Shakespeare. Othello, Act III, Sc. 3)

But the thief can be forced to return my purse and its contents, pay all expenses incurred by me in pursuit of it, and even though he apologizes profusely, he can be sent to prison for committing the theft. Whereas a newspaper or radio station may *wilfully and maliciously* defame my reputation, hold me up to contempt, hatred, ridicule and obloquy, cause me to be shunned and avoided, and then by a mere retraction which may not be seen or heard of by more than one per cent of those who read or heard of the defamation, escape with the payment of such out-of-pocket loss as I may be able to prove to the satisfaction of a jury, but all others guilty of such defamation may be held liable for exemplary, as well as general and special damages. This is the effect of the majority holding in this case. To say that I can not agree with such sophistry is a gross understatement. I challenge its soundness from the standpoint of both reason and authority.

There is no doubt in my mind but that the statute here involved (Civ. Code, § 48a) is unconstitutional in that it traverses both the equal protection and due process clauses of the Fourteenth Amendment to the Constitution of the United States. Criminals in California are treated with more uniformity and equality than an innocent plaintiff who has been defamed. The criminal law draws a distinction between a

defendant who has been guilty of a crime committed through negligence and one who has been guilty of a crime committed with malice. Although the above-mentioned section draws a very definite distinction between members of the same class, and to my mind an unreasonable and arbitrary one, it does not draw any distinction between those guilty of unintentional but negligent defamation and those guilty of wilful and malicious defamation.

Problems of classification under the California Constitution are similar to those presented by the federal equal protection of the law clause of the Fourteenth Amendment. Under either provision, the mere production of inequality which necessarily results to some degree in every selection of persons for regulation does not place the classification within the constitutional prohibition. The discrimination or inequality produced, in order to conflict with the constitutional provisions, must be *"actually and palpably unreasonable and arbitrary."* (*People* v. *Western Fruit Growers,* 22 Cal.2d 494 [140 P.2d 13].) I submit that the legislation in question makes an actual, palpable, wholly unreasonable and arbitrary classification. Newspapers and radio broadcasts are singled out for the extension of a privilege which is not given to individuals, magazine publishers, or other periodicals, skywriters, sound trucks, banner-bearing dirigibles, and billboards, and probably television and motion picture producers. On the other side of the picture, plaintiffs maligned and defamed by those others are given rights and privileges not extended to plaintiffs who have suffered at the hands of newspapers or the radio.

The majority hold that there are two reasons why the classification made by the section is a reasonable one. The first of those reasons is that newspapers and radio stations must be protected against verdicts for excessive damages. Assuming there is any basis for the asserted danger of awards of excessive damages, just why those *two* should be protected against excessive damages any more than magazines, the motion picture industry, or the others above mentioned, is far from clear. All are equally able to carry insurance designed to give such protection.

Moreover, there is no factual or legal basis for the assumption that excessive awards of damages will be made against newspapers or radio stations in actions for defamation of character by individuals who claim to have been libeled or slandered by publications or broadcasts. The assertion in

the majority opinion that juries are disposed to make excessive awards of damages against newspapers and radio stations in actions of this character is not only an unjust reflection upon our jury system, but is factually and historically untrue. While the jury system still has its opponents, it cannot be denied that this system is so firmly embedded in our system of jurisprudence that the latter could not survive without it. It is nevertheless true that ever since the promulgation of the Magna Charta in the year 1215 to the present time there have been those who would destroy the jury system. These reactionary minds decry what they are pleased to refer to as the evils of the system, and extol none of its virtues. Thus, the tendency of juries to award damages to those who have suffered injury or wrong as the result of the wilful, malicious or negligent acts of others is condemned by these opponents of the jury system as an evil which should be abated. But should this reactionary philosophy be injected into our system of jurisprudence by permitting its use as a basis for the classification of tort feasors? The answer to this question should be obvious to every unprejudiced mind. If the jury system is to remain as it has stood for over seven centuries, then it should be just as good for the newspaper or radio tort feasor as any other, and its tendency to award damages, whether large or small, should not be made the basis of a classification which confers special privileges upon certain tort feasors to the detriment of those injured or defamed by them. History conclusively disproves the assertion in the majority opinion that excessive awards of damages have been rendered against newspapers and radio stations in libel and slander actions. Of the 55 libel cases against newspapers (there are none against radio stations) which have come before this court and the appellate courts of this state which I have been able to find reported during the state's entire history, I find that 19 judgments for plaintiff were affirmed. These judgments are as follows: *Wilson* v. *Fitch* (1871), 41 Cal. 363, $7,500; *Edwards* v. *San Jose Pr. & Pub. Soc.* (1893), 99 Cal. 431 [34 P. 128, 37 Am.St.Rep. 70], amount of damages not specified; *Gilman* v. *McClatchy* (1896), 111 Cal. 606 [44 P. 241], $500; *Taylor* v. *Hearst* (1897), 118 Cal. 366 [50 P. 541], $500; *Mize* v. *Hearst* (1900), 130 Cal. 630 [63 P. 30], $6,250; *Dunn* v. *Hearst* (1903), 139 Cal. 239 [73 P. 138], $500; *Graybill* v. *DeYoung* (1903), 140 Cal. 323 [73 P. 1067], $1,000; *Bohan* v. *Record Pub. Co.* (1905), 1 Cal.App. 429 [82 P. 634], $500;

*Tingley* v. *Times-Mirror Co.* (1907), 151 Cal. 1 [89 P. 1097], $7,500; *Ervin* v. *Record Pub. Co.* (1908), 154 Cal. 79 [97 P. 21, 18 L.R.A.N.S. 622], amount of damages not specified; *Lewis* v. *Hayes* (1918), 177 Cal. 587 [171 P. 293], $1,750; *Waite* v. *San Fernando Pub. Co.* (1918), 178 Cal. 303 [173 P. 591], $3,000; *Scott* v. *Times-Mirror Co.*, (1919), 181 Cal. 345 [184 P. 672, 12 A.L.R. 1007], $37,500; *Newby* v. *Times-Mirror Co.* (1920), 46 Cal.App. 110 [188 P. 1008], $7,500; *Earl* v. *Times-Mirror Co.* (1921), 185 Cal. 165 [196 P. 57], $25,000; *Stevens* v. *Storke* (1923), 191 Cal. 329 [216 P. 371], $1,000; *Lyon* v. *Fairweather* (1923), 63 Cal.App. 194 [218 P. 477], $750; *Gloria* v. *A Colonia Portuguesa* (1933), 128 Cal.App. 640 [18 P.2d 87], $21,000; *Behrendt* v. *Times-Mirror Co.* (1938), 30 Cal.App.2d 77 [88 P.2d 949], $10,000.

The foregoing record belies the assertion in the majority opinion that there is "danger of excessive recoveries of general damages in libel actions" against newspapers. This record discloses that during the last hundred years only three judgments of over $20,000 were upheld by the appellate courts of this state, one for $10,000, and the remaining 15 for lesser amounts. True, there were other libel actions in which verdicts were recovered against newspapers, but either new trials were granted or the judgments rendered on such verdicts were reversed on appeal in those cases. To rely upon such a record to justify a preferential classification of newspapers because of the "danger of excessive recoveries of general damages in libel actions," is like a drowning man grasping at a straw. The majority might, with equal logic hold that the Times-Mirror Company is entitled to a preferential classification because five of the above mentioned awards, and by far the largest, were against it. Furthermore, it might with equal justification be said that the Legislature could limit recovery to special damages in personal injury actions against railroads and power companies because of the tendency of juries to make large awards of general damages in personal injury actions against those corporations because of their reputed vast wealth. While a majority of this court might be disposed to uphold such a statute, I am disposed to believe that it would be stricken down by the Supreme Court of the United States as being in violation of the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. I submit that the argument advanced in the majority opinion in support of its preferential classification of newspapers and radio stations on the above mentioned ground is

wholly unsound and utterly lacking in either factual or legal foundation.

The second so-called reason given in the majority opinion to prove that this legislation is not a travesty on the equal protection clause, but is a reasonable classification, is that newspapers must be free to disseminate news. There is a remote possibility that this reason might hold water if applied to inadvertent newspaper libel but it can hardly be called a good reason where the problem is one of malicious libel. In an article cited by the majority (Morris, *Inadvertent Newspaper Libel and Retraction*, 32 Ill.L.Rev. 36), it is pointed out that in at least 10 states (Alabama, Indiana, Kansas, Massachusetts, Michigan, Minnesota, North Carolina, North Dakota, Ohio, and Wisconsin), statutes purport to lessen the severity of the common law in cases in which *inadvertent* newspaper libel is retracted. All of the statutes apply to libel published "*in good faith*," leaving the rigors of the common law intact for the malicious libeler. He points out that "The statutes can be classified into two groups. In the first group the legislatures provided that plaintiff shall recover only actual damages, but did not define 'actual damages.' Courts have interpreted these statutes to mean that non-punitive damages shall be recovered—with the result that the common law is not changed. In the second group of statutes, the legislatures clearly indicated that they intended to eliminate general damages. In these jurisdictions, either the statutes have been held unconstitutional, or the scope of operation of the statute has been so limited that only trifling, if any, change is effected.

"The significance of the legislation is its aim, not its accomplishment . . . The statutes all suffer from a common defect. Each legislature attempted to eliminate the recovery of general damages. Why? I submit that the legislators were impressed with the exculpatory effect of retraction; they recognized the futility of attempting to vindicate the plaintiff by judgment after retraction, and the folly of taking money from newspapers to further that purpose. They then reasoned that since general damages operate to exculpate the plaintiff when the publisher has not retracted, and since the plaintiff has no need of exculpation after retraction which can be served by a money judgment, general damages should not be allowed when the publisher has retracted. *The error in this reasoning lies in the fact that general damages are needed for purposes other than exculpation. The assessment of general damages solves an admonitory problem which does not*

*disappear with retraction.* So the abolition of general damages is not justified on the ground that the exculpatory function cannot be served by their retention.'' [Emphasis added.]

The legislation here involved is certainly discriminatory in that it protects certain members of a class to the detriment of others. The requirement of proof of special damages means virtual abolition of legal responsibility for both inadvertent and malicious libel. It is a very rare situation where a plaintiff can trace and prove the special damage he has suffered from libelous matter printed in a newspaper or spoken over the radio about him. This does not mean that he may not have suffered sharply—but it does mean that he may never hear of business opportunities which would have been his had the ''libelous stain'' not appeared on his name plate. Those who read the libel may not read the retraction and if he loses business or professional opportunities which would otherwise have been his (although he does not know of them, or cannot prove his actual pecuniary loss as to them), he should be compensated for the probable damage he has suffered and that which he will suffer in the future. Surely Mr. Morris is right when he says that ''The tendency toward flamboyance and haste in modern journalism should be checked rather than countenanced.'' The interest of the public in news cannot be said to outweigh the protection which every person is entitled to be given by the law to have his reputation remain unsmirched through malice or negligence. Under the holding in this case, newspapers and radio may freely malign any person and be liable for only special damages if the plaintiff asks for and receives a retraction, or if he does not ask for one. This will in effect allow these two favored means of publication to escape, in most instances, scot free, since the plaintiff will not be able to prove the exact special pecuniary loss he has suffered.

In *Osborn* v. *Leach,* 135 N.C. 628 [47 S.E. 811, 66 L.R.A. 648], the same type of statute was held not to be unconstitutional as a denial of due process of law since ''actual'' damages were held to include *all* save punitive damages. Mr. Justice Douglas, concurring, felt that the statute was unconstitutional as a denial of equal protection of the law. He said: ''. . . I feel constrained to say that, in my opinion, the so-called libel act is unconstitutional, inasmuch as it discriminates between the editor of a newspaper and the ordinary citizen. If I write a letter libeling an editor, that perhaps, at most, 10 people may see, and he libels me by printing identical charges

against me that 10,000 people may see, I am subject to pains and penalties from which he is exempted by operation of the statute. Whatever other merits the act may have, I do not think that such discrimination can be sustained under the explicit provision of our Constitution . . .''

In *Park* v. *Detroit Free Press Co.*, 72 Mich. 560 [40 N.W. 731, 1 L.R.A. 599], a statute such as ours was held unconstitutional as a violation of due process of law, and the court said that a person's reputation was a species of property and that a retraction statute which left him with a remedy only when he could prove special damages was leaving him with no effective remedy inasmuch as special damages were impossible of proof in the majority of cases. The same result was reached in *Hanson* v. *Krehbiel*, 68 Kan. 670 [75 P. 1041, 104 Am.St. Rep. 422, 64 L.R.A. 790]. In *Meyerle* v. *Pioneer Pub. Co.*, 45 N.D. 568 [178 N.W. 792], the court held that the purpose of the statute was to give the publisher of a newspaper, ''who through mistake or misapprehension in regard to the facts, in good faith publishes a libelous article, an opportunity to retract and thereby, as far as possible, undo the wrong which he unintentionally did to the party libelled.'' It was held that the plaintiff, after retraction, could not recover exemplary damages, but would be entitled to recover such general or special damages as would compensate him for the injury which remained unsatisfied after the publication of the retraction.

As an article in 23 So.Cal.L.Rev. 89 (1949) points out, ''English and American courts have long recognized the admissibility of retractions to mitigate damages in libel actions. But every statute that has attempted to benefit publishers by substituting a retraction for plaintiff's right to recover general damages in libel actions against newspapers has been challenged on constitutional grounds. Two were held unconstitutional as violative of due process and equal protection (*Hanson* v. *Krehbiel, supra; Park* v. *Detroit Free Press Co., supra*, approved in *McGee* v. *Baumgartner*, 121 Mich. 287 [80 N.W. 21, 22]); two were judicially rewritten to include general damages (*Osborn* v. *Leach, supra; Meyerle* v. *Pioneer Pub. Co., supra*), and *only one* was allowed to emerge completely unscathed.'' The *one* which emerged ''completely unscathed'' is the Minnesota statute involved in *Allen* v. *Pioneer-Press Co.*, 40 Minn. 117 [41 N.W. 936, 12 Am.St.Rep. 707, 3 L.R.A. 532], cited in the majority opinion. It must be noted that in the Allen case (decided by a divided court

and sent back for a new trial), the statute involved provided that the plaintiff could still recover general damages, *even if the retraction were published, unless the defendant could show that the libelous publication was made in good faith and under a mistake as to the facts.* This holding the majority opinion does not mention. It, therefore, appears that the holding of the majority in this case is in conflict with every decided case involving a similar statute.

Even if I assume that the majority is correct in stating that a cause of action for libel or slander was not frozen in our Constitution (*"Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; . . ."* [Art. I, § 9]), I maintain that the person injured by such libel or slander has a cause of action guaranteed to him by the due process clause of both Constitutions. (Cal. Const., art. I, § 13, and the Fourteenth Amendment to the Constitution of the United States.) If the Legislature should abolish causes of action of replevin and conversion (trover) leaving me thus remediless for the loss of my car, I would consider that I was being deprived of my property without due process of law, and I consider the loss of reputation a valuable property right which cannot be taken from an individual without giving him a fully adequate legal remedy so that he may be compensated, so far as possible, for the loss he has suffered and which he will suffer from the wrong done him.

We may now assume that the Legislature (pushed by the powerful pressure groups which play such a shameful but important part in securing the adoption of special privilege legislation), having succeeded so well with its initial efforts (present statute held constitutional), may well decide next that all causes of action for libel and slander shall be abolished. In this connection, let me point out that the "guest" statutes and causes of action for alienation of affections and breach of promise to marry, etc., are *not* good illustrations of the power of the Legislature to abolish a cause of action for an injury. The guest does not have to ride in a car as a guest, and affection is an intangible attribute incapable of possession. From the beginning of time in this country it has been understood that marriage is a "commodity" that cannot be forced on men and women. An entirely different factual situation is presented where an innocent person is defamed, either negligently or maliciously, and suffers irreparable injury to his professional, occupational or business

reputation because of it. The least that can be done by the guilty one is to make such reparation in the form of money damages as will enable the maligned one to live until such time as he may again build up his reputation.

This court held that a trade-mark and a trade-name are worthy of protection because through them the owner or possessor creates and preserves a "favorable reputation," to stimulate the sale of a product, and to distinguish it from similar competing products. (*Sun-Maid Raisin Growers* v. *Mosesian,* 84 Cal.App. 485 [258 P. 630].) Injury to the standing and reputation of a business becomes an injury to the good will of the business, and infringement upon a trade-mark which results in injury to the good will of the business may be enjoined. (*Hall* v. *Holstrom,* 106 Cal.App. 563 [289 P. 668].) Words which are the subject of the good will and reputation of a business they designate, are entitled to the same protection as that afforded to one who has the prior right to a trade-mark, a symbol, character or words which have no common meaning and which are artificial. (*Eastern Columbia, Inc.* v. *Waldman,* 30 Cal.2d 268 [181 P.2d 865] ; *Barnes* v. *Cahill,* 56 Cal.App.2d 780 [133 P.2d 433] ; *Hoyt Heater Co.* v. *Hoyt,* 68 Cal.App.2d 523 [157 P.2d 657] ; *Jackman* v. *Mau,* 78 Cal.App.2d 234 [177 P.2d 599] ; *Weatherford* v. *Eytchison,* 90 Cal.App.2d 379 [202 P.2d 1040].) And why are damages given in such cases? It is obvious that the *reputation* acquired by a business is in large measure responsible for the profits it makes. Why is a tremendous sum spent every year in advertising the good·reputation built up over the years in the manufacture of certain products? If this money is lost because business is lost because of the libel or slander published by a newspaper or broadcast over the air, has the one so advertising lost nothing in the nature of property? Any professional man's income or profit depends on his reputation for honesty, integrity, fair dealing, ability and ethical practices, and he will suffer in the same indefinite, but nevertheless very substantial, way by its impairment or deprivation.

"There is no room for holding, in a constitutional system, that private reputation is any more subject to be removed by statute from full legal protection than life, liberty, or property. It is one of those rights necessary to human society that underlie the whole social scheme of civilization." (*Park* v. *Detroit Free Press Co.,* 72 Mich. 560 [40 N.W. 731, 1 L.R.A. 599].) These damages (to a person's reputation) are in the

nature of a property right; they have been said to constitute property. (See 17 C.J. 710, 829, 841. See Newell on Libel and Slander, p. 841; *Pratt* v. *Pioneer Press Co.*, 35 Minn. 251 [28 N.W. 708]; *Cruikshank*.v. *Bennett*, 30 Misc. 232 [62 N.Y.S. 118]; *Adams* v. *Scott*, 33 S.D. 194 [145 N.W. 446]; 17 R.C.L. 430, 431; *Osborn* v. *Leach, supra*; *Meyerle* v. *Pioneer Pub. Co., supra*.)

When a cause of action arises it has a legal value as a chose in action—it is a species of property. Even where there is no legal measure of damages, as in case of slander or assault, the injured party has an indeterminate right to compensation the instant he receives the injury. The verdict of the jury and the judgment of the court thereon do not give, they only define, the right. Such right, when vested, is to the injured party, of the nature of property, and is protected, as property in tangible things, is protected. It cannot be annulled or changed by legislation, nor extinguished except by satisfaction, release or the operation of statutes of limitation. (1 Sutherland on Damages, § 7, p. 26.)

In holding a similar statute unconstitutional, as being in violation of the due process provision of the Fourteenth Amendment to the federal Constitution, the Supreme Court of Kansas said: ''From the writings of the world's wisest men we have the assurance 'that a good name is rather to be chosen that great riches.' Yet the possessor of this thing of greatest value, being despoiled of it, is left entirely without remedy for its loss by the statute in question, except in such rare cases as he shall be able to show some exact financial injury in the particulars named.'' (*Hanson* v. *Krehbiel,* 68 Kan. 670 [75 P. 1041, 1042, 104 Am.St.Rep. 422, 64 L.R.A. 790].)

From the time of the Declaration of Independence the people of this country have declared that unalienable rights are ''life, liberty, and the pursuit of happiness.'' Both Constitutions (California and United States) declare that no person shall be deprived of any of these rights without due process of law. In order to preserve life, in most instances, it is necessary for men to work that they may provide for themselves and their families. No member of this court can deny that a good reputation is something to be highly prized and cherished. No member of this court can deny that one's reputation has a great deal to do with the position one holds—whether it be public office, a profession, a business, an occupation, or the social position one holds in his community, his state, or his country. The section of the Civil Code under

consideration here evidently considers that a retraction published is a fair compensation for the inestimable, uncountable damage which newspapers and radio stations are capable of causing to an innocent person. A school teacher labeled, either *negligently* or *maliciously*, as a communist, may *not* lose her position, but she may lose an opportunity for advancement of which she will not be aware. A doctor, dentist, attorney, candidate for public office, an actor, actress, singer, businessman or woman—all of these may lose opportunities, clients, patients, positions, and business, because of the defamation. These lost opportunities will not, in the general course of events, come to the attention of the loser. He has suffered a loss for which the defamer should pay. The injured person is *not* compensated by a retraction which may not be read or heard by all who read or heard the defamatory words. We have all heard the expression used among our contemporaries that "where there is so much smoke there must be some fire." Since this expression has survived from the days of the Greek philosophers (Euphues and his Euphoebus, Arber's reprint, 1579) until the present, it would seem a fair assumption that people will go right on saying and believing it. This court, in holding this statute constitutional, is depriving the injured person of a property right. As was said in the Hanson case (*supra*) : "It is suggested, however, that the retraction required by the act to be published is a fair compensation for the injury done, and a reinvestment of the libeled one with his good name. This being done, all has been accomplished that would be by a verdict of a jury, and hence that the retraction required by the legislative enactment is, if not 'due course of law,' an ample substitute for it. It is not an easy task to deduce either from reason or the authorities a satisfactory definition of 'law of the land' or 'due course of law.' We feel safe, however, from either standpoint, in saying these terms do not mean any act that the Legislature may have passed if such act does not give to one opportunity to be heard before being deprived of property, liberty, or reputation, or having been deprived of either does not afford a like opportunity of showing the extent of his injury, and give an adequate remedy to recover therefor. Whatever these terms may mean more than this, they do mean due and orderly procedure of courts in the ascertainment of damages for injury, to the end that the injured one 'shall have remedy'—that is, proper and adequate remedy—thus to be ascertained. To refuse

hearing and remedy for injury after its infliction is small remove from infliction of penalty before and without hearing.''

The following statement in the majority opinion deserves some comment: ''Moreover, in balancing the danger of recoveries of excessive general damages against leaving plaintiffs with no effective remedy for injury to their reputations, the Legislature could properly take into consideration the fact that a retraction widely circulated by a newspaper or radio station would have greater effectiveness than a retraction by an individual and could thus class newspapers and radio stations apart.'' This argument is clearly and concisely answered by Professor G. W. Paton (University of Melbourne, Australia) in his article *"Reform and the English Law of Defamation,"* (33 Ill.L.Rev. 669). Professor Paton states that the law of torts exists to grant a certain security to a person's reputation, physical integrity and good, and, if that security be invaded, to award damages. The power of the press to destroy the reputation of an individual is so great that strict rules are necessary to secure a balance. He says that ''It is true that there are speculative litigants whose one desire is to reap a golden recompense for some fancied slight: that sometimes a person, with no real reputation to lose, recovers damages based on the view that he had a reputation: very occasionally a newspaper has suffered because a fictitious name it has chosen fits someone in real life. *All this is admitted, but the corollary of the great power of the modern press is a strict sense of responsibility for the reputation of those who lie at their mercy and, as it is Utopian to consider that such an attitude of mind can be induced save by the severest sanctions of the law, strict liability is justifiable by its effect.* It must be remembered that a newspaper has no professional privilege to traffic in the reputation of others.'' [Emphasis added.] The last statement in the just quoted article is to be found in libel cases against newspapers decided in this state prior to the enactment of the legislation here considered. It should be noted that rather than imposing stricter liability upon newspapers and radio stations because of the great power they possess to ruin the reputation of others, either carelessly or maliciously, the section provides for a lesser liability! To illustrate the utter futility of a newspaper or radio retraction, consider the case of a candidate for public office who has been publicly and falsely accused a few days before election of having committed several crimes, of being a person of low character and of dishonest nature. He requests a retraction

which, if time permits, may be given before the election, or if time does not permit, after the election. He is not elected. He cannot prove that the libel caused him to lose the election although he and his advisors are certain it was the cause. Consider, too, that he has lost the election because untrue defamatory matter was widely published about him and *that this may have been done maliciously for that very purpose.* Consider, too, that because of it, the possibility of a favorable outcome of any future election is very remote. Is this candidate for public office to have no restitution from the one guilty of the wrong? The majority opinion says "No." I do not agree.

The majority state that "This court is not in a position to weigh the relative importance of the conflicting interests involved, and even if it were it should not attempt to do so." It most assuredly *is* the duty of this court to scrutinize carefully any legislation in order to determine whether it is unreasonable or discriminatory. The people have the right to expect that the members of this court will possess the courage and integrity necessary to declare unconstitutional any legislation which contravenes the rights of the people as set forth in the due process and equal protection clauses of both Constitutions. This court should invoke these constitutional guarantees to protect the rights of those who are wronged by such legislation and should not be servile to *any* interest or influence regardless of the power it wields.

The majority opinion quotes from a dissenting opinion written by the late Justice Oliver Wendell Holmes in the case of *Baldwin* v. *Missouri,* 281 U.S. 586 [50 S.Ct. 436, 74 L.Ed. 1056], in which he speaks of the tendency of the court to give over emphasis to the due process provision of the Fourteenth Amendment in striking down legislation. Mr. Justice Holmes was not there concerned with a statute conferring a special privilege upon a particular group such as we have here, but was concerned with a taxation matter. I have no doubt that the great liberal minded Mr. Justice Holmes, with his courage, wisdom and foresight, would be the first to speak out against special privilege legislation of this character in order that it might be struck down as violative of both the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States.

I have hereinbefore referred to pressure groups and their obvious effect upon legislation in this state. By this reference

I do not mean to cast the slightest reflection upon the members of the California Legislature, past or present. Both my son and I have served as members of this body, and I am in a position to know that, considering the great variety and the tremendous importance of the problems presented, the time available for their consideration and solution, and the pressure exerted by different groups seeking special privilege legislation, the members of the Legislature render a commendable public service and are entitled to the confidence, respect and commendation of the people of this state. But I am not so naive that I do not realize that they may yield to some of the pressure exerted, and with reference to the particular legislation here under consideration, that that pressure may have been of a most powerful nature. It is not unlikely that the constitutional prohibition against this legislation was considered by the Legislature and that that body concluded that this was a matter for the courts to determine. It is just as probable that the Legislature was not favored with the arguments here advanced against this legislation on constitutional grounds before adopting it. Since I feel so strongly that this statute violates the due process of law and equal protection provisions of both our state and federal Constitutions, I would be violating my solemn oath to support both of these Constitutions if I did not cast my vote as a member of this court to strike it down—and this I have done.

I would, therefore, reverse the judgment.

SCHAUER, J., Dissenting.—It is only in respect to privilege as to deliberately false and malicious publications by newspapers that this dissent is directed.

I think that there is a substantial difference between, on the one hand, an inadvertently false defamation and, on the other hand, a defamation which is known to be false and which is wilfully and maliciously published. That difference, it seems to me, assumes legally significant importance when we examine the constitutional questions which are raised by the subject legislation. I agree in large measure with Justice Traynor's discussion of the constitutional principles involved but I do not agree that those principles extend to the protection of the publication of defamatory matter which is known to be false and which is deliberately and maliciously uttered.

Justice Traynor says, ''There are at least two bases on which the Legislature could reasonably conclude that the retraction provisions of section 48a provide a reasonable sub-

stitute for general damages in actions for defamation against newspapers and radio stations, namely, the danger of excessive recoveries of general damages in libel actions and the public interest in the free dissemination of news.''

Considering the above stated two bases in relation to maliciously and deliberately uttered known-to-be-false defamations, I think that their substance completely vanishes. The first asserted base is ''the danger of excessive recoveries of general damages in libel actions.'' But does the policy of the state consider, or permit this court to believe, that there is any danger of ''excessive recoveries of general damages'' in libel actions which are based on knowingly false, deliberate and malicious publications? Why does the law provide for punitive damages, as against other defamers, where the matter is known to be false and is deliberately, wilfully and maliciously published? If the state has any such policy as is suggested for base No. 1, why does it provide that in all libel cases other than against a newspaper or radio broadcasting company (under the conditions specified in Civ. Code, § 48a), where the conditions of malice, knowledge and wilfulness obtain, that punitive damages may be assessed?

Base No. 2 is stated in the majority opinion to be ''the public interest in the free dissemination of news.'' But surely the license, whether limited or unlimited, to wilfully, knowingly and maliciously utter false and defamatory matter does not serve ''the public interest in the free dissemination of news''; rather does it tend to defeat that interest by encouraging the malicious dissemination of matter known to be false.

It is contended, in defense of the majority position, that the legislation can be sustained ''not because the malicious conduct of such persons ought not to be actionable, but because, if their conduct were actionable, actions would be brought against them in cases in which they had not spoken falsely and maliciously . . . And the real question is whether it is proper on grounds of public policy to remit such questions to the judgment of a jury.'' The example cited in the text as quoted by the majority opinion is the immunity given participants in a judicial proceeding. The argument is not persuasive to me. The most regular participants in judicial proceedings are judges. Judges of courts are public officers, responsible to the people; while they may not be sued for libel or slander as arising out of judicial acts, they are not self-

selected or self-constituted, and they are subject to election and recall. The people have no such power over newspaper publishers who, conceivably, can be completely irresponsible. Likewise, as to other participants (than judges) in judicial proceedings, there is a fundamental difference between their relationship to such a public governmental proceeding and the relationship of a publisher to his private enterprise; so too, is there a very basic difference between a court, which is an institution of government, and a newspaper, which is a private enterprise. (And it is to be devoutly hoped that the difference shall never be destroyed.)

Furthermore, I think that section 9, article I, of our California Constitution is entitled to more significance in its application here than is accorded it by the majority. It provides that ''Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.'' I think that the clause ''being responsible for the abuse of that right'' has affirmative rather than mere negative significance. I think that responsibility for abuse of the right is a fundamental part of our concept of freedom of speech and press. It forms a part of the definition of the very liberty which is guaranteed. Unless there is responsiblity for abuse of the right then such right becomes more than a ''liberty''; it becomes a license. The malicious and deliberate publication of that which is known to be false, uttered for the sole purpose of injuring the subject, is not, in my estimation, within the freedom guaranteed by the Constitution. Rather is such a publication an ''abuse of that right'' to which the liberty does not extend.

The courts have been most zealous to protect freedom of speech and press against *prior* restraint. There is no accepted principle of constitutional law which suggests that they should be so zealous to absolve from *subsequent* responsibility for a clear abuse of the liberty. Indeed, the very strictness of the rule against prior restraints bespeaks need of subsequent responsibility for abuses.

Even if we assume, notwithstanding the provisions of section 9, article I, relative to responsibility for abuse of the right, that the Legislature could completely abolish the cause of action for libel, such assumption does not save the statute here. The Legislature has not abolished a cause of action; neither has it undertaken to define an ''abuse of that right''

for which the publisher may be responsible. If the subject statute had extended the exemption to general damages only it would be far easier to defend. But by framing the statute to exempt both general and punitive liability for the most pernicious abuse to which a newspaper may be put, it seems that what the Legislature has really done is to create a special privilege for an arbitrarily selected class. The special privilege is exemption from liability for general and punitive damages for libel, whether deliberate and malicious or merely inadvertent, unless a retraction is requested and refused. The retraction, if demanded and published, may be followed immediately by a new defamation. By the express terms of the statute it extends the exemption to include the deliberate and malicious publication of known falsehoods. Since the privilege is extended to deliberately false and malicious publications it is, in effect, a license to defame. Such privilege or license is extended to, and only to, newspapers and radio broadcasting companies. The metropolitan daily and the rural weekly have the privilege; United States News and World Report, Time Magazine, Esquire, Fortune, etc., do not. What reasonable basis is there for giving the ''newspaper,'' whether daily or weekly, such license to deliberately and maliciously defame while withholding that license from magazines of every type? Why should magazines and publications generally, other than newspapers and radio broadcasting companies, be subject to punitive as well as general damages for malicious publications while the special class is exempt? Assuming that there is a reasonable basis for the classification insofar as inadvertent libel is concerned, I find none for such classification in relation to the special privilege to deliberately defame.

At the beginning of this discussion I pointed out that the majority opinion declares the proposition that ''There are at least two bases on which the Legislature could reasonably conclude that the retraction provisions of section 48a provide a reasonable substitute for general damages in actions for defamation against newspapers and radio stations, namely, the danger of excessive recoveries of general damages in libel actions and the public interest in the free dissemination of news.'' It has been shown that both of those bases disappear when applied to deliberately false and malicious publications. And there is a still more fatal inadequacy in the majority position.

The fundamental part of their proposition is that the

"Legislature could reasonably conclude that the retraction provisions . . . provide a reasonable substitute for general damages in actions for defamation against newspapers and radio stations." That proposition completely ignores the element of punitive damages. The statute relieves its beneficiaries from liability for punitive as well as general damages. What reasonable substitute is provided for punitive damages? Certainly not the retraction provision. In full compliance with the law and shielded by it, the publisher could follow every retraction with a reiteration of the same or a still more calumnious defamation. There is sound policy behind the law which provides for exemplary damages in certain cases. (" [W]here the defendant has been guilty of oppression, fraud or malice . . . the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294.) If this law is good generally what reasonable basis is there for exempting "newspapers and radio stations" in relation to their deliberately false and malicious publications?

I reiterate that it is only in respect to the licensing, in effect, of deliberately false and malicious publications that this dissent is directed. I cannot think that the great body of reputable newspapers and radio broadcasting companies which serve our country and our people so well would ever stoop to the vicious practices which the statute would permit. But there is nothing to prevent vicious persons from entering the publishing business and from taking full advantage of the law as it is upheld. The reputable publishers themselves may in the long run suffer more from the nefarious practices of which the law permits and which it encourages than they would from defending a few libel actions against the unfounded charge of falsity and malice.

Since the majority opinion affirms the judgment on the theory that section 48a is valid in its every element and application I do not discuss whether what I believe to be the invalid portions or applications of the statute could be deleted and the remainder upheld. Likewise, for the purposes of this dissent, I accept the implications of the majority that affirmance of the judgment depends on sustaining the statute in its entirety.

For the reasons above stated I would reverse the judgment.

Appellant's petition for a rehearing was denied May 11, 1950. Carter, J., and Schauer, J., voted for a rehearing.